**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

ROSA SLY
DEVONA HOLLINGSWORTH          Case No.: 8:17-cv-1868-T-33-AAS
     Plaintiffs,

v.

ROBERT WILKIE, Secretary,
DEPARTMENT OF VETERANS AFFAIRS,
     Defendant.

                                  /

## PLAINTIFFS' RESPONSE TO DKT. 125 SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MSJ

Plaintiffs, Rosa Sly and Devona Hollingsworth, by and through their undersigned attorneys hereby file their Response to Defendant's Memorandum in Support of its Motion for Summary Judgment (RMSJ).

## INTRODUCTION

*Babb v. Wilkie*, 140 S. Ct. 1168 (2020) and *Babb v. Sec'y*, 992 F.3d 1193 (11th Cir. 2021) made significant changes not only in the notion of causation but also in the conduct which violates the federal sector ADEA and Title VII. Defendant's Motion for Summary Judgement (MSJ), Dkt. 125, downplays those changes and relies upon the facts it asserted were undisputed material facts supporting arguments under the *McDonnell Douglas v. Green* standard. However, the *McDonnell Douglas* framework has been abrogated, it no longer applies to federal employee Title VII claims. 992 F.3d at 1204-05. Neither do cases arising under 42 U.S.C.§2000e-2(a). Both significantly affected the prior MSJ and this Court's Order. The statute under which the claims arise

and only case law which interprets or applies such law should be considered when deciding the elements of the claim. See e.g. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 553, 67-68 (2006); (42 U.S.C. §2000e-3(a) contains different language than §2000e-2(a) and has a different materiality provision which must be applied); *Babb v. Wilkie* 140 S.Ct. 1168, 1171-1178 (2020) (rejected Defendant's efforts to conflate case law, held the "made free from any" language in the federal employee ADEA 29 U.S.C. 633a is "markedly different" than the causation language in 2000e-3(a), and *Univ. of Texas Southwestern Medical Center v. Nassar,* 520 US 338 (2013) *and Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009) do not apply, nor does liability depend upon the ultimate decision); *Gomez-Perez v. Potter* 553 US 474, 479-91 (2008) (the "made free from any" is broad enough to include retaliation, therefore challenges based on the lack of specific retaliation language such as that found in §2000e-3(a) were rejected); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19 (1993) (interpreted the language of §2000e-2(a)); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020) (rejects *Harris v. Forklift's* severe and pervasive test as inapplicable to §2000e-3(a) claims); *Babb v. Sec'y, supra* (Eleventh Circuit rejected a phalanx of arguments by Defendant and found that *Babb v. Wilkie* is applicable to Title VII claims and that *Burlington Northern's* analysis of the materiality provisions, with its emphasis on circumstances should be applied to federal employees).

It is important to assess Defendant's arguments against these cases, because some still blur these lines. For example, it argues a material adverse action still needs

the attributes of an adverse employment action and ignores *Burlington Northern's* admonition to look at management acts in context. As for circumstances, Defendant ignores them and while the prior Order referenced some of this history there is no analysis of how that history together with the actions taken could affect a reasonable person in the Plaintiffs' circumstances. The prior order only found material adverse actions in discrete acts which satisfied the adverse employment action requirements emanating out of 2000e-2(a) cases.

Similarly, without circumspection Defendant accepts the benefit of an order which rejected statements and actions evidencing racial and EEO activity animus as not relevant to the ultimate decisions left after a 2000e(2)(a) analysis but ignores the statements along with other circumstances evidencing differential treatment, material adversity, and the law of personnel actions. As to the other discrete acts, the discussion will explain that each and the hostile work environment (HWE) are personnel actions under federal law and explain why the MSJ should be denied.[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if after considering the plaintiffs' evidence the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). The substantive law applicable to the case determines which facts

---

[1] The Eleventh Circuit has vacated decisions based on the *McDonnell Douglas* framework or severe and pervasive HWE analysis. That vacates the entire judgment divesting . . . its binding effort. U.S. v. M.C.C. Fla. Inc. 967 F.3d 1559,1561 (11ᵗʰ Cir. 1992). However, Plaintiff recognizes this is new law so errors we point out are done with the same understanding the Eleventh Circuit gave us in one area. 992 F.3d at 1202-1208.

are material and which are irrelevant. See *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of proving that no genuine issue of material fact exists." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir 2002). Once the moving party has met this burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial. *Id.* at 1224-25. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The judge may not make credibility determinations at this stage. *King*, 576 Fed. App'x at 928. In evaluating the movant's motion for summary judgment, "the district court must view all evidence in the light most favorable to the non-moving party." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.

## II. DISCUSSION

### A. The *Babb* Standard.[2]

In *Babb v. Wilkie*, the Supreme Court held that the statutes' requirement that "personnel actions" be "made free from any discrimination" "demands that personnel actions be untainted by any consideration of" a protected characteristic. *Id.* at 1171. The Court has explained that, under the federal-sector language, "[i]f  .   .   . discrimination plays any part in the way a decision is made, then the decision is not

---

[2] The focus will be on the fully briefed and argued decisions creating the new law, and not on cases involving pro se plaintiffs (Debe), unpublished decisions or ones where issues were not fully briefed.

4

made in a way that is untainted by such discrimination." *Id.* at 1174 (emphasis added);

*see also Id.* at 1179 (Thomas, J., dissenting) (explaining that the majority's test imposes

liability if an agency's personnel actions are at all tainted by considerations of age").[3]

　　In *Babb v. Sec'y, Dep't of Veterans Affairs*, 992 F.3d 1193, 1199 (11th Cir. 2021),

the Court examined *Babb v. Wilkie* before finding it applicable to Title VII cases:

> In *Babb*, the Supreme Court held that the "free from any discrimination"
> language means that personnel actions must be made in "a way that is not
> tainted by differential treatment based on" a protected characteristic. 140 S. Ct.
> at 1174. In so holding, the Court initially examined each of § 633a(a)'s
> constituent terms. First, the Court briefly defined "personnel actions." Pointing
> to the Civil Service Reform Act of 1978, the Court assumed that the term
> "personnel actions" in § 633a(a) included "most employment-related decisions,
> such as appointment, promotion, work assignment, compensation, and
> performance reviews." *Id.* (citing 5 U.S.C. § 2302(a)(2)). Section 633a(a), the
> Court emphasized, commands that such "personnel actions" "be made 'free
> from' discrimination." *Id.* As for "free from," the Court took it to mean
> "'untainted' by." For good measure, the Court observed, Congress's placement
> of the word "any"—as in, "made free from any discrimination"— reinforced
> the purity requirement. *Id.*; *see also Id.* n.2. The term "discrimination," the Court
> assumed, carries "its normal definition, which is differential treatment." *Id.*
> (quotation marks omitted). Two terms remained. "Based on" generally
> signifies "a but for-causal relationship." *Id.* (quoting *Safeco Ins. Co. of America v.
> Burr*, 551 U.S. 47, 63 (2007)). Finally, "shall be made," the Court explained,
> expresses "the imperative mood," and thereby
> emphasizes the duty of making—that is, rendering or producing—personnel
> actions without "the taint" of discrimination based on age. *Id.*
>
> Having dissected the statutory terms, the Court then explained the relationship
> among them, giving special emphasis to two "matters of syntax." *Id.* First, it
> observed that the adjectival phrase "based on age" "modifies the noun
> 'discrimination,' " not "personnel actions." *Id.* "As a result, age must be a but-
> for cause of discrimination—that is, of differential treatment—but not
> necessarily a but-for cause of a personnel action itself." *Id.* The second
> syntactical matter involved the adverbial phrase "free from any
> discrimination." Because that phrase modifies the verb "made," it tells us "how
> a personnel action must be 'made.'" *Id.* Accordingly, "[i]f age discrimination
> plays any part in the way a decision is made," then that decision necessarily "is

---

[3] As the Court recognized in *Gomez-Perez v. Potter*, 553 U.S. 474, 479-91 (2008), "made free from any discrimination" prohibits retaliation, because retaliation is discrimination.

not made in a way that is untainted by such discrimination." *Id.* at 1174. Add it all up, and the takeaway is this: "[T]he statute does not require proof that an employment decision would have turned out differently if age had not been taken into account"—i.e., does not require that age discrimination be the but-for cause of an adverse personnel decision. (emphasis added).

In *Babb v. Sec'y*, the Court proceeded to address the government's argument that *Babb v. Wilkie* should not change the result in that case because the District Court had found Plaintiff could not establish pretext and that should be enough to preserve its summary judgment. Instead, it held:

> But it's not. In the course of rejecting one of the government's arguments before it in *Babb*, the Supreme Court specifically explained that its ruling did "not mean that age must be a but-for cause of the ultimate outcome." 140 S.Ct. at 1174 n.3. Rather, "[i]f, at the time when the decision is actually made, age plays a part, then the decision is not made "free from" age discrimination." *Id.* (emphasis added). Indeed, the Court expressly clarified that "age must be the but-for cause of *differential treatment*, not that age must be a but-for cause of the *ultimate decision." Id.* at 1174; *accord, e.g., Id.* at 1171 ("The plain meaning of the critical statutory language ('made free from any discrimination based on age') demands that personnel actions be untainted by any consideration of age."). We can't square the government's backstop argument with the *Babb* Court's reasoning:
>
>> Thus, "free from any discrimination" describes how a personnel action must be "made," namely, in a way that is not tainted by differential treatment based on age. If age discrimination plays any part in the way a decision is made, then the decision is not made in a way that is untainted by such discrimination.
>> *Id.* at 1173-74
>
> So, even when there are non-pretextual reasons for an adverse employment decision – as the government says there are here – the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations. Cf. *Id.* at 1173 ("[A]ge must be a but- for cause of discrimination – that is, of differential treatment – but not necessarily a but-for cause of a personnel action itself."). Without quite saying as much, then, it seems that the Supreme Court accepted *Babb*'s argument "that the District Court should not have used the *McDonnell Douglas* framework." *Id.* at 1172.

*Id.* at 1204-05 (emphasis added). In rejecting the *McDonnell Douglas* standard, the Eleventh Circuit considered a hypothetical that had been briefed by *Babb*'s

attorneys. The Eleventh Circuit discussed the hypothetical which appears at p.1174 of the Supreme Court's decision, as involving a person having five points deducted from their score when applying for a job because of a protected characteristic (their age) but that the younger person who obtained the job had scored 10 points higher on legitimate factors. This hypothetical helps to crystallize the difference between how Defendant read, and still might read, the key phrase. The Supreme Court recognized that in that hypothetical, age did not affect the ultimate decision. The older person did not lose the job due to discrimination. He would have lost it anyway to the person who obtained the job. However, the Supreme Court found that the employer still violated the statute because age was a consideration, or played a role in the process of making the decision. *Id.* 140 S.Ct. p.1174; 992 F.3d at p.1205. In three parts of its decision, the Supreme Court held that would make the employer liable and subject to injunctive and other prospective relief. 140 S.Ct. 1171, 1176-78. See also J. Thomas dissent at 1180.[4]

The Eleventh Circuit found the critical statutory language as interpreted by the Supreme Court rejected *McDonnell Douglas* as a framework to decide federal employee claims. 992 F.3d at 1204-05; *see also Durr v. Secretary Department of Veterans Affairs* 843 Fed.Appx.246,247(11thCir.2021) ("Because both the *McDonnell Douglas* framework

---

[4] Please note that if the Supreme Court did not render this opinion, it would be recognizing that it was acceptable for a federal employer to have a process in which discrimination played a role, as long as the employee could not prove that it caused, motivated or was a factor in the ultimate decision. Doing so would, have made the language "free from any discrimination" meaningless. 140 S.Ct. at 1171, 1178. The court knew that this standard was dramatically lower than the standard applied to all other employees under Title VII, however, they recognized that was Congress's decision. 140 S.Ct. pp1176-1178. As for "but-for" proof of differential treatment, that was suggested by *Babb's* attorneys not the Defendant, and we will discuss below what that should mean.

and convincing mosaic testing are methods of showing the protected characteristic was the but-for cause of the <u>ultimate decisions,</u> those tests no longer apply.").

## B. Full Relief.

Having held that if discrimination played any role in the decision making-process it would result in an employer's liability, the Supreme Court turned to full relief in part D of its opinion.  The Court recognized that Congress, was concerned about the difficulties in addressing discrimination in the federal workplace, and it had a desire to rid the federal government of discrimination when making personnel actions and used "*made free from any*". *Id.* at 1176-78. After discussing some of that history, the Court considered other remedies and  <u>chose</u> a long time Supreme Court method to determine entitlement to broader remedies when illegitimate considerations are involved in constitutional, Title VII and certain other violations, *Texas v. Lesage*, 528 U.S. 18,20-22 (1999) and *Mt. Healthy Cnty Bd. of Ed. v. Doyle*, 429 U.S. 274, 285-7 (1977). Those cases trace from constitutional cases which recognize that the violator had the burden to show that its violation did not taint the ultimate actions, because it is in  the best position to do so. This approach was originally made in some criminal cases and expanded to civil rights cases. *Mt. Healthy* helped form the basis for the Supreme Court's <u>Title VII</u> decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12 (1989). While the first violation gives a plaintiff the right to injunctive and prospective relief, the employer, will not be liable for full relief if it can show that it would have made the same decision in any event. See e.g., *Id.*140 S.Ct. at 1171,1176-

78, Dkt.105p.2-9.[5] Thus, because of the "made free from any" language if the employer overcomes the taint the employee is <u>denied complete relief</u>, but still can obtain injunctive and prospective relief. *Id.* at 1171,1178. It is respectfully submitted that this dichotomy underscores the Supreme Court's recognition that by putting in the language "made free from any" Congress wanted to protect Federal employees in a way they chose not to protect private, state and local government employees.*Id.*at1176-78. Congress intended to give federal employees greater rights. *Id.*

*Babb's* interpretation also inherently creates a statutory mixed-motive case as the Government asserts it should not have to provide full relief because other lawful reasons motivated the personnel action. As discussed more fully in Dkt.105p.1-9, in mixed-motive cases, burden shifting to the employer to show the same decision defense within a "but-for" causation analysis has been historically required by the Court in employment cases. *Texas v. Lesage*, 528 U.S. 18,20-22 (1999); *Mt. Healthy Cn'ty Bd. Of Ed. v. Doyle*, 429 U.S. 274,285-7 (1977); *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393,401-402 (1983); *Price Waterhouse v. Hopkins*, 490 U.S. 228,230,241-249 (1989).[6]

---

[5] One can see this in the pin cites the court uses when citing *Texas v. Lesage* and *Mt. Healthy*. The cite to *Texas v. Lesage* is directly to the part where the burden is shifted to the employer. While *Mt. Healthy* has that same discussion, the Court cited to the point in *Mt. Healthy* which reversed the District Court for not giving the employer the ability to overcome the taint.

[6] Given Defendant's fixation on the phrase "but-for" please note that other Supreme Court cases recognize that burden shifting in *Mt. Healthy* and mixed motive cases establishes "but-for causation". *See e.g., Neives v. Barlett* 139 S.Ct. 1715, 1722-23 (2019) ("we have simply taken the evidence of the motive and the discharge as sufficient for circumstantial demonstration that one caused the other shifting the burden to Defendant to show he would have taken the challenged assertion even with the impermissible motive.") In *Hartman v. Moore* 547 U.S. 250, 259-260 (2006) ("It is clear, moreover, that causation is understood to be but-for causation without which the adverse action would not have been

Here Defendant ignores its burden and overstates the evidential basis needed to establish that a Title VII characteristic was the "but-for" basis for "differential treatment."

## C. Differential Treatment.

The term "discrimination" denotes its "normal definition" which is "differential treatment" 140 S.Ct. 1173. It can be established with the same type of evidence that has been used to show discrimination except that it does not have to affect the ultimate decision. Both the Supreme Court and the Eleventh Circuit have recognized that when mixed motives are involved, all the circumstantial evidence must be considered. *Quigg v. Thomas County School Dist.*, 814 F.3d 1227, 1237-1238 (11th Cir. 2016); (*McDonnell Douglas* is inappropriate for evaluating mixed motive claims because it is overly burdensome.) *Desert Place, Inc. v. Costa*, 123 S.Ct. 2148, 2154, 539 U.S. 90 (2003),("circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") Outside the *McDonnell Douglas* pigeonholing framework and overarching concern for the ultimate decision any evidence which allows discrimination to be inferred should be considered. *Secg Furno*

---

taken.") The Eleventh Circuit has also recognized these cases are but-for cases *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1290 (11th Cir. 2019); *Brooks v. Miller*, 158 F.3d 1230, 1242 (11th Cir. 1998); *Pulliam v. Pallapoosa County Jail*, 185 F.3d 1182, 1188-89 (11th Cir. 1999). These decisions bring into focus the Court's determination that Congress asked the U.S. Government to accept more responsibility for its employees than employers of non-federal employees. See 140 S.Ct. at 1176-77. Otherwise, federal victims of race, sex, religion, or other forms of discrimination under Title VII would have lesser rights than their non-federal counterparts. Under EEOC regulations, federal agencies have long had to carry their own burden with respect to the same decision defense. See 29 C.F.R. 1614.401; *see also* EEOC Enforcement Guidance on Retaliation and Related Issues, No.915.004 (Aug. 25, 2016) (available at www.eeoc.gov/laws.guidance/retaliation-guidance.cfm)

*Const. Corp. v. Waters* 438 U.S. 567,575 (1978); (An absence of a credible explanation of procedurally irregular conduct is circumstantial proof of wrongdoing.) *International Broth. of Termsters* U.S. 431 U.S. 324,335 (1977). ("Discrimination" can be inferred from differential treatment.) There has been no credible explanation let alone briefing by Defendant for failing to hire up to 7 employees or repair 3 of 4 critical machines both of which the OIG found responsible for backlogs. Dkt.71-20p.117/136. This was Brown and DGH's responsibility according to HR. Dkt.71-9p.1. Countless other irregular changes, irregular conduct, occurred without an <u>undisputed</u> credible explanation. Other evidence of historic retaliation, including targeting, and caselaw supporting its use is discussed on pages 1-14 of Dkt.71. In *Mesnick v. General Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) the Court also describes evidence to show retaliation:

> These include, but are not limited to, evidence of differential treatment in the workplace, ..., statistical evidence showing disparate treatment, ..., temporal proximity of an employee's protected activity to an employer's adverse action, ..., and comments by the employer which intimate a retaliatory mindset.

Other ways to show discrimination are discussed in *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644-45 (11th Cir. 1998) (and cases cited herein) (failure to promulgate hiring and promotion policies can be evidence of discrimination as can bending or breaking rules to harm a candidate). Some of these cases involve showing pretext. While that issue should not be involved in this mixed-motive case, those cases help show the types of evidence that can be used to show a jury issue on differential treatment during the process. Failure to rebut a prima facie case defacts summary judgment. *Figuera v. Pompao,* 223 F.3d 1078,1095 (D.C. Cir. 2019). Direct

evidence maintains its traditional definition (i.e. standard jury instructions) and should be considered along with all the circumstantial evidence when responding to an MSJ. The history of retaliation here is not just probative of retaliation, but statements evidencing hostility to EEO activity which have been matched by a line of cases (action), puts the evidence of what was done to Sly and Hollingsworth over any line to require a trial. Similarly, the statements by DGH of racial animus toward blacks and black managers by Brown together with this evidence and violations of *Farrgaher* and *Ellerth,* the destruction of respective roles requires a trial on differential treatment during the process of making personnel actions.

These points are especially important here because of footnote 3 at 140 S.Ct. 1174-5. The Court noted that the taint has to continue until the decision is made. It gives an example where a <u>non-decisionmaker</u> recommends someone based <u>in part</u> age. The decisionmaker takes swift and complete action to wipe any taint from the process. Had he not done so this remark <u>could</u> have tainted the decision. In this case no such action has ever been taken. Actions and statements about black manager and EEO bias have tainted the process of making the decisions in this case. See e.g. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154. F.3d 344, 354–355 (6th Cir. 1998).

**D. Process of Making a Personnel Action/Decision.**

The process referred to under 42 USC§2000e-16(a) is the one which leads to a personnel action or actions. In this case those processes were first alleged in the complaint. Under the Plaintiffs' theory of the case, and the facts they have presented, the entire process of making these decisions changed Sly's duties and working

conditions improperly. Collectively they created a HWE which as will be discussed in the next section is a personnel action under 5 U.S.C. §2302(a)(1)(xii). While many discrete acts could have been identified, some included an extended period, while others are individual incidents of the broader personnel actions being taken against Sly by DGH. Together with non-discrete acts they became a HWE under §§(xii). Its ultimate goal was to get rid of her and it included any supervisor who would not help do that, including Plaintiff Hollingsworth. For example, in Sly's case the process is described in the complaint as *inter alia*:

> ¶42. When Griffin-Hall took over the Business Office, she created a hostile work environment designed to prevent Plaintiff Sly from performing her duties in order to drive Plaintiff Sly out of her position, and cause her demotion or removal.

The Plaintiffs' theory of the case has been that this process was continued, indeed it was one Brown used before, and it was designed and used here to place blame on Sly and to take action against her. Dkt.83¶66. These allegations were followed by facts. Once the personnel action(s) process is identified one can look for differential treatment during that process. In a retaliation context one must consider the context/circumstances of management acts as discussed under FACTS.

## E. Retaliatory Hostile Work Environment.[7]

The Eleventh Circuit also reversed the District's Court's decision on the retaliatory HWE claims. *Id.* as 1206-1209. It held that the *Burlington Northern*

---

[7] Again, we will focus on what the cases that made controlling law said after briefing. Pro Se cases, unpublished cases, unbriefed cases and arguments ordinarily are a source of off target results.

materiality standard is applicable for retaliatory HWE's. *Id.* That standard rejects the severe and pervasive materiality standard that had been applied to federal employees in *Gowski v.* Peake 692 F.3d. 1299 (11th Cir. 2012). A form of that standard was argued by the government, and used when granting the MSJ on retaliatory HWE claims. However, in *Monaghan* the court stated at 955 F.3d a6 861-62:

> Third, mistreatment based on retaliation for protected conduct- for example, making or supporting a charge of discrimination- is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 548 U.S. at 68, 126 S.Ct. 2405 (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C. Cir. 2006)). *Burlington Northern* recognized that this retaliation standard protects employees more broadly— and is more easily satisfied—than the standard applicable to claims of discrimination. *See id.* at 67, 126 S.Ct. 2405. Claims of this kind—retaliation claims—arise under 42 U.S.C. § 2000e-3(a). In contrast to the disparate-treatment provision, § 2000e-2(a)(1), the retaliation provision is not limited to discrimination with respect to compensation, terms, conditions, or privileges of employment.

> In *Crawford v. Carroll,* 529 F.3d 961 (11th Cir. 2008), we recognized that *Burlington Northern* set out a different standard for retaliation claims. We said that under *Burlington Northern,* "in the context of a Title VII retaliation claim, a materially adverse action 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 974 (quoting *Burlington Northern,* 548 U.S. at 68, 126 S.Ct. 2405). We applied the "well might have dissuaded" standard again in *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010).

> Not surprisingly, every other circuit also has adopted this standard for retaliation claims after *Burlington Northern.* (Citations omitted.)

The Supreme Court in *Burlington Northern* explained its holding while stating *inter alia*, 548 U.S. at 69:

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and

relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale, supra,* at 81-82, 118 S.Ct. 998. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. Cf., *e.g., Washington, supra,* at 662 (finding flex-time schedule critical to employee with disabled child). A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. See 2 EEOC 1998 Manual § 8, p. 8-14. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." *Washington, supra,* at 661.

To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale,* 523 U.S., at 81, 118 S.Ct. 998. But here, the jury had before it considerable evidence that the track laborer duties were "by all accounts more arduous and dirtier"; that the "forklift operator position required more qualifications, which is an indication of prestige"; and that "the forklift operator position was objectively considered a better job and the male employees resented White for occupying it." 364 F.3d, at 803 (internal quotation marks omitted). Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee.

Defendant claims to recognize a change was made; however, it describes its effect in language which is often identical to its prior arguments, under the erroneous "severe and pervasive" HWE standard and while conflating cases and citing decisions involving pro se plaintiffs or which, are unpublished or unbriefed. See e.g., Dkt.125p.7,13. Most importantly, it rejects the *Burlington Northern* standard by refusing to discuss the <u>circumstances and context</u> that are critical to an assessment of <u>the acts</u> management took. The above excerpt is part of a greater discussion requiring a focus on <u>the acts</u> and their effect they could have on the individual involved. Defendant hops

right over that to switch the focus to aggravating conduct it claims is lacking, but that is not *Burlington's* standard. There is a never-ending supply of "doesn't have this" to avoid application of the correct standard.

When a movant seeks summary judgment the movant must first establish that the undisputed facts support the grant of summary judgment before the non-movant must respond. That begins with identifying material facts. *Anderson, supra* at 248. Material facts are determined by the applicable law. *Id.* Where, as here, Defendant has failed to identify the material facts entitling it to summary judgment under the *Babb v. Wilkie* and *Babb v. Sec'y* standard, the opposing party should not have to respond to the MSJ. *Id.* While we believe that the Plaintiffs should prevail on that law alone, the Court has previously issued an order which sought to address both the discrete acts and HWE under the facts and law it then had before it. Therefore, we will not solely rely on the Plaintiffs' prior RMSJ and the arguments, notice and pleadings contained in Dkt's.78,98,102,103,105,110,118 (in particular No.'s 98 and 105), but will address the material facts and law including the HWE.

**F.  The HWE Is a Personnel Action.**

Significantly, the HWE alleged in the complaint and described below is a personnel action. Courts and agencies have recognized a HWE can constitute a "personnel action" or "significant change in working conditions." *Savage v. Dep't of the Army,* 122 M.S.P.R. 612, 627 ¶23 (2015) (explaining that §§(xii)'s phrase significant change in duties, responsibilities and . . . working conditions "should be interpreted

16

broadly, to include 'any harassment or discrimination that could have a chilling effect on whistleblowing or otherwise undermine the merit system.'"). The Federal Circuit in *Sistek v. Dep't of Veterans Affairs,* 955 F.3d 948, 955 (Fd. Cir. 2020) stated:

> "A retaliatory investigation, either on its own or as part of a broader set of circumstances, may qualify as a personnel action if it rises to the level" of a "significant change in duties, responsibilities, or working conditions." *Id.*, 5 U.S.C. § 2302(a)(2)(A)(xii).

After briefing which included the arguments made here, *Babb v. Sec'y* recognized that a federal employee HWE under 2000e-16(a) is actionable. 992F.3d at 1208-9. Defendant ignores all the Plaintiffs history of being rated outstanding for the 30 years of her career (Ex.A); high level managers (Roussos, Bowman, Accetta, Bronner, Hollingsworth) who describe diminishment, chaos and destruction of her role as a supervisor, coupled as we will discuss with DGH's abuse of authority.

Given legal inaccuracies in Defendant's HWE arguments, one should understand how caselaw conceptionalizes HWE's. Each legal event of a HWE does not have to reference the alleged discriminatory conduct. See e.g., *Robinson v. Jacksonville Shipyards, Inc.,* 760 F. Supp. 1486, 1524 (M.D. Fla. 1991)*.* Contrary to Defendant's motion which tries to isolate each act and argue isolated explanations, *Gowski* makes clear that it is the overall HWE, not each isolated act that is at issue. *Gowski* at p. 1312-1313; *see also Walker v. Ford Motor Company,* 684 F.2d 1355, 1359 (11th Cir.1982). Objective severity is determined by the totality of the circumstances. See e.g., *Gowski, supra,* 1312; *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1510-11 (11th Cir. 1989); *Andrew v. City of Philadelphia,* 895 F.2d 1469, 1484 (3rd Cir. 1990)

(a play not isolated scenes); *Walker; Robinson*. While we are no longer dealing with the severe and pervasive standard in *Gowski,* the context/circumstances can still be used to decide if there is a significant change in duties, responsibilities or conditions.

Sly and Hollingsworth's observation of harassment of others and vice versa must also be considered. See *Reeves v. CH Robinson Worldwide, Inc.,* 525 F.3d 139,144-5 fn2,3 (11th Cir.2008) (victim observing others); *Jackson v. Quanex Corporation,* 191 F.3d 647, 660-1 (6th Cir 1999) (victim observing others); *Quinn v. Consolidated Freight Ways Corp. of Delaware,* 283 F.3d 572, 578 (3rd Cir. 2002) (another observing victim).

Finally, Defendant rejects Supreme Court precedent when it argues that only conduct <u>after</u> Sly filed her June 2015 EEO claim in this case can be considered.Dkt.125p.11. If one act of harassment occurs within the 45 days, all like or related acts of harassment get in and are not time barred. See e.g., *National Railroad Passenger Corporation v. Morgan,* 536 US 101, 122 S. Ct. 2061, 2072 (2002); *Shields v. Fort James Corporation,* 305 F.3d 1280, 1281-82 (11th Cir. 2002). Numerous events which are part of Sly's HWE claim were within 45 days of the initial claim. Because the incidents falling outside that period are like or related, they "collectively constitute one unlawful employment practice," and the entire claim is actionable because at least one incident that is part of the claim occurred within 45 days of the EEO Counselor contact in 2015. *Id.* In this case, ongoing harassment has taken place, and although some may be older than others, they were not isolated events. This was a continuing event of harassment. See e.g. *Robinson v. Jacksonville Shipyards, supra.* At 1524-7; *Smart*

*v. City of Miami Beach*, 2014 U.S. Dist. Lexis 30123 [*8] pp. 4-5. If some discrete acts that are part of this HWE claim are not independently actionable because they were not timely raised, the Plaintiff cannot get separate relief for these discrete acts. Under the cited cases those acts are still part of the timely raised HWE claim and can be considered in determining the significance of the HWE under §2302(A)(xii) and the appropriate remedy for the HWE. See also *Gowski, supra.* at 1312-13. [8]

In addition to recognizing the HWE is a personnel action Federal employee case law also recognizes conduct that should add <u>significance</u> in the Federal work place. When an employer dresses down or makes fun of a subordinate in front of other employees it can be an abuse of authority. [9] An abuse of authority is wrong doing under 5 U.S.C. §2302(b)(8). DGH repeatedly abused her authority to demean, degrade, blame, dismiss and target Sly, often in front of other employees, including her direct subordinates. Dkt.71-14p.66¶'s6-11;pp.74-80¶'s4-12.

This court recognized that the plaintiffs have raised a jury question on certain discrete acts (the lower personnel appraisal, the reprimands and Hollingsworth's

---

[8] The Defendant's position is wrong, but partly plays on a correct concept. A retaliatory HWE would have to be after Sly engaged in EEO activity, but that can include an informal or formal complaint as well as opposition, or participation in Mary Mells case in 2013 and 2015. Dkt.71¶'s11-12. Citation to RMSJ including internal cites. In this case despite the passage of time a jury can find all of that activity and her 2008 EEO complaint against the Business office which Kris Brown oversaw. Dkt.71p.29. Roxanne Lainhart Bronner's affidavit states when DGH first took over she brought up Bronner's EEO activity in the *Cote/Gowski* case and Sly's EEO complaint in 2008. Dkt.71-3¶'s2,5,6. From the beginning she "clipped" Bronner's wings and criticized Sly and her competence and told Bronner that Brown disliked black managers. *Id;Id.*¶8; Dkt.71-6p.129/164(93:3-10).

[9] That can be an abuse of authority and a prohibited personnel practice. See *Murphy v.Dep't of the Treasury,*86 M.S.P.R. 131, 136-137 (MSPB June 7, 2000); *Lane v. Dep't of Homeland Security*, 115 M.S.P.R. 342, 355-356 ¶'s29,20 (Dec. 17, 2010). Dressing down an employee in front of other employees, indeed her subordinates, can be actionable "bullying". See e.g., *Special Counsel v. Costello,*75 M.S.P.R. 562, 580 (June13,1997) rev'd on other grounds 182 F.3d 1372 (Fed. Cir. 1999).

termination). Those were part of the intended fallout of DGH's prior actions that ruined the efficiency of the ROI section and created backlogs, missing requests and inefficient changes to standard practices and procedures. *Id.*,Dkt.71¶16-19. The plaintiff's case presents sworn statements that these issues resulted from the change in Sly's duties, responsibilities and working conditions. A jury can find the ultimate goal was to take an outstanding employee, blame her for actions which DGH caused and Brown knowingly allowed, and to create a HWE which would either drive her out or ultimately discipline her out with Brown's assistance. DGH drove out any manager who wanted to help Sly, including terminating Hollingsworth. Sly <u>has at this point two strikes against her in a three-strike system.</u> Dkt.86pp.2-4.

FACTS

We have already addressed the facts asserted by Defendant under the *McDonnell Douglas* framework in prior pleadings and will not repeat those. We will focus on the *Babb* standard and emphasize facts we believe are material which were not considered in the Court's Order. *Babb* states "[i]f discrimination plays any part in the way a decision is made, then the decision is not made in a way that is untainted by such discrimination." *Id.* at 1174. Many are accustomed to looking only at conduct which directly causes the ultimate decision. While such conduct can be differential treatment, *Babb* recognized that the "made free from any" language covers any discrimination (differential treatment) that played <u>any role</u> in the decision-making process.

### A. <u>Determining Material Facts After *Babb*</u>

After *Babb* one should be looking at differential treatment in the process of making decisions and considering all the facts not just, or as in this case at all, facts that relate to a prima facie case, pretext or the ultimate decision. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016). Moreover, direct evidence under *McDonnell Douglas* restrictions should no longer apply because we should not be looking solely at the ultimate decision. Direct evidence in the normal sense can and should be considered along with all the other circumstantial facts in deciding if a case should go to the jury. In this court's earlier opinion, it recognized there is a dispute about whether certain FRE 801(d)(2)(D) statements were made by DGH about Brown being opposed to black managers. It recognized that there are several people on opposite sides. Dkt.87p.22. However, the court did not find these statements were direct evidence relating to ultimate decisions because they did not meet *McDonnell Douglas* requirements for the discrete acts selected. Those requirements do not control the analysis of whether those statements are ones the jury should consider on differential treatment. They <u>must</u> be considered along with all the other evidence showing differential treatment in the decision-making process. They show there is a jury question on whether that treatment was based on Title VII factors (i.e., race). As for retaliation there is overwhelming statements, conduct and legal cases which a jury must consider when deciding if differential treatment was based on EEO activity.

The court should also consider what "the process of making a decision" is. That requires understanding that personnel actions are part of the merit system principles of a federal work-place and consider the time period of events involved in those

actions. When DGH took over the Business Office, she created a HWE designed to prevent Plaintiff Sly from performing her duties and responsibilities in order to drive Plaintiff Sly out of her position, or cause her demotion or removal. Dkt.83¶42. DGH had no experience with Release of Records or the processes or procedures being used. Dkt.71-14p.66etseq.¶'s6-9. Nevertheless, without collaboration with the expert, Sly, or Roussos, she began to change those processes and procedures. Exhibit B corroborates other managers assessment of Sly. *Id.*¶'s4,5,9. That treatment never happened to Sly before. It is inconsistent with her duties and responsibilities as a supervisor. As employees left either by normal attrition or in response to DGH's conduct, positions were not filled or were delayed being filled. Dkt's.71-14p.66¶'s4-12; 71-9p.1. As a result, backlogs developed to an extent never seen before. Dkt.71-14p.66¶9;71-3¶10. DGH then used those backlogs to openly criticize Sly. Dkt.71¶'s10-19;Dkt.71-7p.76etseq;Dkt.71-14p.73¶'s5-10;71-14p.66¶'s4-12. She has openly criticized Sly in front of her employees. *Id.* DGH also engaged in various other practices which have impaired Sly's ability to perform her supervisory duties and Plaintiff Sly's employees' abilities to perform their duties within the ROI office.*Id.* Supervisor's Brown, Rousso, Bronner have provided sworn declarations testifying that DGH targeted Sly. *Id.* Dkt's.71-14p.76¶6;71-14p.66¶'s4-12;71-3. Targeting is differential treatment. *Lee v. Russell County Board of Educ.* 689 F.2d 769, 775 (11th Cir. 1982). DGH has also attempted to create division between Sly and her employees and openly criticize Sly's "leadership" abilities despite her long record of exceptional performance. Ex.A. DGH has continued hostile and harassing conduct to the present. Collectively these are

examples of both differential treatment and a significant change in her duties, responsibilities and working conditions. 5 U.S.C. §2302(a)(1)(xii). She and Brown have also disciplined her, lowered her evaluation. DGH instituted a performance improvement plan (PIP) which is often the beginning of creating a record to remove an employee.  DGH filled out the form and ordered Patricia Bowman to sign and give it too Sly. She did but later claimed Sly passed. Dkt.71-14p.77/270¶'s7-8.

Defendant's claim that Kris Brown is not a decisionmaker in this case is incorrect. There is evidence a jury can use to find an *Ercegovich* involvement. Moreover, under VA harassment policies, see Dkt.71-16p.8/63, employees are entitled, in fact they are required to bring claims of harassment to managers above the employee who is making the claim or those engaging in harassment. While the manager above DGH is Brown the evidentiary record is replete with efforts by Sly to bring DGH's harassing conduct to the attention of Brown, but Brown continually refused to fairly respond. Dkt.71-7p.89¶35. [10] Therefore, Sly brought the conduct to the next higher supervisor, Director Klinker, who would refer Sly's complaint back to Brown. *Id.* Under the VA harassment policy both management had a duty to

---

[10]This is similar to the situation where a co-employee harasses someone, let's say for argument purposes, sexually. The employee in that circumstance needs to complain to at least her supervisor before the employer can be liable. See *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765 (1998) and *Farragher v. City of Boca Raton,* 524 U.S. 775, 805-6 (1998). These cases establish that when management does not act even with regard to a non-manager, the employer can be liable. Brown never investigated Sly's complaints. When the sexual harassment is done by his supervisor that alone makes the employer liable, but the fact that it was reported to upper-level management and they did nothing to stop it directly implicates them in the harassment that occurred. It also brings in their retaliatory or racially discriminatory enabling Sly to ask the jury to consider whether or not DGH was taking these actions against her along with Brown. From a retaliatory perspective, the tie-in is even clearer because the discriminatory conduct Sly complained about was Brown's.

investigate Sly's complaints and to address them. Its failure to do it allows a jury to at least conclude that it accepted, and was behind the harassment that DGH was engaging in. Therefore, their statements both retaliatory and racial, are relevant. Hollingsworth unsuccessfully complained to Brown in December 2016 about DGH.[11]

## B. <u>Adverse Actions Based on Title VII Characteristics</u>

The next consideration is whether those actions are based on retaliation or discrimination as referenced in *Babb*. SeeDkt.71¶'s2-31.[12] Included in that is whether they are materially adverse actions. *Burlington* strongly suggests it is for a jury to decide whether anything moved than the most petty and frivolous actions against an employee are "materially adverse" to him. As mentioned, the court's prior order recognizes that a jury can make that finding with regard to certain ultimate decisions. Dkt.87pp.34,35,39. It is important to recognize that the very basis of the reprimands was the process DGH set up. It is also the process that led to significant changes in the supervisor's duties, responsibilities and working conditions under §§(xii) and involved abuses of authority, backlogs and missing requests which never happened to Sly before. Dkt.71p.7/40¶2. So, in one sense it has already been decided, but it is worth noting that. As with Dr. Zachariah in the *Gowski/Cote* case, those backlogs were used

---

[11] When it comes to race no black manager (Sly, Hollingsworth) who complained to Brown was helped but Wendy Shaw Hillman and Jackie Crews were. Dkt.71-3¶7. They then helped attack Sly and Bronner respectively. All managers of any race that sought to help Sly were unsuccessful. Indeed, they were pushed out.

[12] A racial HWE is a personnel action but the remaining discussion addresses retaliation claims. As to race those claims will be limited to discrete acts. As discussed above Brown's statements about black managers together with the other facts should result in discrete act coverage. We also believe that the cases cited on page 39 of the RMSJ entitled Hollingsworth to racial discrimination claims because the notion of adding a basis is not limited to retaliation as the cases on page 39 show.

to discipline Sly as part of the effort to drive her out. Dr. Zachariah was removed before the EEOC process made it to court. *Id. see also,* 692 F.3d 1299, 1306 (11th Cir. 2012). Here EEO activity began sooner and it has not finally happened yet.

Regarding the retaliatory HWE this case should be an instructive example of *Burlington Northern, Crawford, Babb v. Sec'y* and *Monaghan.* Circumstances matter. However, the focus upon "severe and pervasive" and "adverse actions" under Section 2000e-2 took Defendant's arguments and this Court's analysis away from that. *Babb v. Wilkie, Monaghan* and *Babb v. Sec'y* are efforts by higher courts to emphasize the need to apply prior Supreme Court precedent and Congressional statutes. *Burlington Northern* demands one look at the circumstances a reasonable person would be in to determine if <u>management actions</u> are a "material adverse action". If that analysis is not made error results.

In its MSJ Defendant argued together with citation, Order p.30, to cases that it either overstated or previously helped to create and claimed that if someone actually filed an EEO claim, they cannot establish a material adverse action.[13] *Monaghan* recognizes that efforts like using the "severe and persuasive" standards, and we submit

---

[13] Presumably, under the government's theory they could still assert an "adverse employment action". Surely one must see this is a fatally flawed circular argument rejecting the reasonable person standard of *Burlington Northern, Babb v. Sec'y* and *Crawford.* Not surprisingly in each of these cases the employee had engaged in EEO activity one or more times. Defendant may view EEO retaliation victims' as not preserving Title VII rights but rather taking advantage of an employment situation, but the later mentality is foreign to the legal principles of Title VII. Hopefully those cases recognize as the Supreme Court did in *Gomez-Perez* that unchecked retaliation will affect all employees and destroy discrimination protections. A jury decides these sorts of arguments. However, the important point is that this entire discussion is another distraction from the responsibilities to asses managements actions in context.

these arguments, walk back *Burlington Northern* and are direct rejections of the specific language and purpose of the statute and Supreme Court precedent. 955 F.3d at 861-62. *Monaghan* and *Babb v. Sec'y* recognize that when it comes to a HWE, which, as mentioned, is itself a material adverse personnel action under 5 U.S.C. §2301(a)(1)(xii), use of the severe and persuasive notion undermines both an analysis of discrete acts and the events in the HWE. In this case, <u>only</u> matters which are adverse employment actions under 2000e-2(a) discrimination case law (e.g. reprimands, evaluations causing lost salary, termination) have been found to be discrete acts. However, as will be discussed, personnel and other actions which well may deter a reasonable employee from engaging in EEO activity are not only found in adverse employment actions or in severe or pervasive events. None of *Burlington's* analysis is about that. Many of the events the court rejects as material adverse actions in the Order may well dissuade EEO activity under 42 U.S.C. § 2000 e- 16. They were rejected without any argument by Defendant of the Plaintiff's circumstances or context or analysis of the effect of those on a reasonable employee. These circumstances **begin** with something central to the Complaint and the Plaintiffs' arguments in their response to the MSJ. The history of retaliation at the Bay Pines VAHCS. It included Brown, both by her own statements and actions, and by her own place in the facility and the cases cited. Dkt.71¶'s5-13. This history especially as it mimics other cases create the facts from which a jury can find Sly and Hollingsworth's differential discriminatory treatment was based on retaliation.

The circumstances in this case involve a long history of retaliation which was

ongoing when DGH was put over Sly by Brown instead of terminated as HR expected. Dkt.71-10p.57etseq.¶'s3e-g. Other managers described DGH as targeting Sly. *Id.*Dkt.71¶16,Dkt.71-14p.66¶'s6-10. A jury can find targeting to be differential treatment and that it could deter a reasonable employee. *Lee, supra.* The retaliation used at Bay Pines tried to destroy the careers and reputations of employees who had engaged in EEO activity. Dkt.71¶'s1-13. Both the attack on Sly's reputation and career as well as Hollingsworth's confirms that fact. It has happened many times to <u>more than</u> the 33 people in 19 cases who had the strength to fight it. Dkt.71-16pp.62-63. Since Brown was in management working directly with the main RMOs of that scheme: Director Wallace Hopkins, Chief of Staff George Van Buskirk, Chief of Medicine Luthium Lin and Chief Hospitalist Sacharanda Patel. Dkt.71¶'s1-13, 71-16p.21 et sq. Newspaper confirmed this history. *Id.* pp.41-42;71-17p.1 et seq.;71-19pp.1-2. That history has to also affect how a reasonable employee would feel about both the acts that are being taken against him or her and the significance they attribute to those acts, as they grow in number, variety and impact. It's part of the context not discussed by Defendant or the court when analyzing the HWE.

Sly is in a facility with a long and well-known history of retaliating against employees that engage in EEO activity. The central witness in *Cote/Gowski* was Roxanne Lainhart Bronner. Dkt.71-2pp.1-9. Prior to her decision to refuse to help management retaliate in return for a GS-12, and also before her critical testimony in *Gowski*, the person who management had "mentor" Bronner when they wanted her to be "ruthless" and join this scheme, was Brown. Dkt.71-3¶12. Brown told Bronner that

she needed to do what management wanted to have done to get ahead. *Id.* To her credit but not reward she refused. Brown was also involved in a series of cases that played a critical role in retaliatory actions at Bay Pines. We discussed cases of retaliation in which Brown played a direct and important role, including Elzayat, Trimble, Gowski, Dudley, Jones, LaFond, the Police case, Cote/Gowski and others. Dkt.71¶'s1-13. She teamed up with Van Buskirk or the Director or both and others in Cote/Gowski Elzayat, Trimble and the Police case. *Id.* A reasonable person in Sly's circumstances would recognize the seriousness of actions being taken by Brown or her subordinates after she rejected their scheme or opposed discrimination against others like Mary Mells, (racial discrimination–black). Dkt71¶'s11-12. Bronner did the better thing and so did Sly. They lived up to the principles of Title VII. Sly had been an <u>outstanding</u> employee for over 30 years and indeed, the <u>facility's</u> employee of the year in one of them. Ex.A;Dkt.71-7p.75. Brown gave DGH her current position after  well-known problems in HAS. Dkt.71¶'s14,15. Again, this might well dissuade a reasonable person from engaging in any EEO activity as a result of the material adverse actions by DGH especially when Brown does not stop them. However, as to Brown, <u>Sly had already engaged in EEO activity as DGH told Bronner</u>. Dkt.71pp11-12. Indeed, DGH presented an affidavit protecting Brown in *Mells* case. Deterrence increases when one considers DGH. DGH did such a poor job including targeting employees and veterans, at HAS that an independent AIB recommended actions against her which Brown admits included either termination, or, demotion and lengthy suspension. Dkt.71¶'s14-15. Instead, Brown ignored HR, gave DGH money, a Chief

of Service position and an excellent rating for spending a year and a half in a library during an AIB that had a bad outcome for DGH. *Id.* Whether or not Brown wanted to reward DGH's protection of management on its improper participation in the well-known national scandal involving electronic waiting lists which harmed veterans, or to just to use her, like she and other RMO's used people willing to help victimize the plaintiffs in the *Gowski* case and others (be "ruthless"); or whether DGH's sworn EEO case based upon race and retaliation (Dkt.71¶'s14-15) caused Brown to act, does not really matter. Many have seen, read and heard what the scheme has done to others. For present purposes, Brown's relationship with DGH has to concern a reasonable person and deter a reasonable employee from engaging in EEO activity, especially after DGH engages in unprecedented interference of ROI and blames Sly while Brown repeatedly violates Supreme Court case law by ignoring Sly's complaints of an HWE. *Ellerth, supra; Farragher, supra.* When management does not act even with regard to a non-manager, the employer can be liable. Brown never fairly investigated Sly's complaints. Add to that the fact DGH confirmed a reasonable black manager's belief that Brown was prejudiced against black managers.

Sly is supervised by DGH in a hostile workplace. DGH and Brown's actions make retaliatory sense but no business sense especially from the standpoint of the efficient operation of ROI with its past history. Backlogs skyrocketed and so did missing requests. Dkt.71¶'s18,19. Long time highly rated supervisors left because of the conduct of someone who has created HWE's before. A jury should be able to decide what non-retaliatory reasoning managers can show will explain why this is

being allowed to happen <u>again</u> and whether a reasonable person in those circumstances might well be dissuaded from engaging in EEO activity against DGH or Brown given the history. It is reasonable that person might well be concerned about what that means for her future as DGH dramatically increases the backlogs and resulting missing requests. It is reasonable for that person to be concerned that she is being set-up for failure and future actions. It is unreasonable to sit unfairly by while this happens to one of the few people to defend their rights. It is unreasonable to deny them Title VII protection because they file an EEO claim and either have the courage, or know it is their only hope.[14]

It is also reasonable for a reasonable person in ROI or elsewhere this facility to become aware of what is happening to Sly or Hollingsworth and for them to be deterred from EEO activity. A reasonable person who saw what was happening to establish effective supervisors including ones who knew who Sly was and tried to support her. What choice do lower-level people have? Consider the circumstances of a continual removal of supervisors who know the truth and were between Sly on the one hand, and DGH and Brown on the other. Dkt.71-14p.66etseq.,p.76¶6. This includes Hollingsworth by termination and Evelynn Roussos and John Accetta by HWE. *Id.* Bronner quickly had her "wings clipped" and was later increasingly isolated from Sly and eventually left the facility. Dkt.71-3¶'s9-13. Bowman left and never came

---

[14] DGH, <u>not</u> the Privacy Office, blamed Sly for missing requests and used it to try get her disciplined and even suspended. Dkt.71-14p.73,¶6. That would have to affect how a reasonable person felt about the other actions. Again, DGH did it all under, and with Brown, who violated her responsibilities under *Ellerth* and *Farragher* by not helping Sly when repeated requests were made. Instead, Brown allowed two strikes in a three-strike system.

back. Not only are supervisory levels of separation taken away but knowledgeably protective ones. These circumstances also matter. Sly may be more justice or tough minded than some but a reasonable minded person would also ask herself why Brown protects Wendy Shaw-Hillman when she complains about DGH, but not Sly, Bronner, Hollingsworth, Roussos, Accetta or some others who were in a position to help Sly. When Shaw-Hillman, like others before her ends up helping to criticize the targeted employee that would also affect a reasonable employee and deter EEO activity. There is no way the actions taken against Sly would not deter a reasonable employee. The court should see that all of this evidence is relevant to the basic elements of this case. Some of it is also relevant and admissible under Rule 404(b) for each of the admissible reasons in that rule. *Goldsmith v. Bagby Elevatort,* 513 F.3d 1281 (11th Cir. 2008); *Demers v. Adams Homes of Northwest Fl. Inc.,* 321 Fed. App'x 847, 853-4 (11th Cir. 2009). The important point is that these are questions jurors should consider when deciding reasonableness under the circumstances. Most of these actions involve differential treatment at a targeted Sly and based upon her EEO activity.

Against this backdrop, they should also consider that all of the actions diminished, took away or changed Sly's supervisory duties and responsibilities, on repeated occasions. A jury can find this involved targeted differential treatment. DGH took Sly's supervisory duties away and gave her the duties of staff employees. She repeatedly changed processes and procedures unilaterally often without involving Sly. That is a big part of Sly's job. DGH repeatedly engaged in conduct which was designed to ridicule embarrass and undermine Sly in the performance of her supervisory duties

31

in front of her subordinates.

A jury can find these contributed to the creation of backlogs which led to material adverse actions yet DGH blamed Sly for causing them. While the OIG found that the primary reasons for backlogs was because positions were not filled, (as many as 7), and equipment was not repaired, (as many as 3 of 4 critical machines), the reasonable person already knows these are factors because Sly, Bronner, Accetta and Roussos raised them. Dkt.71¶'s16-19. Sly presented sworn statements of others including the responsible HR representative that vacancies were DGH and Brown's responsibilities. Dkt.71-9. So too approved of repairs. A jury also can find from the testimony of Sly, Hollingsworth, Bronner, Bowman, Roussos and several other employees that DGH usurped Sly's supervisory duties and changed procedures in a way that created the backlogs or missing requests for which she later went after Sly. All of this is differential treatment which a jury can find is targeted and based on retaliation.

In accordance with *Burlington Northern, Babb v. Sec'y* and *Monaghan* this Court needs to reject the Government's invitation to deny a federal employee their rights under the law by joining in its arguments to ignore or reject the consideration of circumstances or context which show a reasonable employee may well have been dissuaded from engaging in protected activity. That is especially true when this facility's past history of retaliation includes using many of the same tactics to set up employees and supervisors for discipline and discharge. Dkt.71¶'s1-16. Under all the circumstances a jury is entitled to consider the events taken against Sly, individually

and together because it can find they may well deter a reasonable federal employee from engaging in EEO activity. They also involve differential treatment during the entire process of making these decisions. Sly and the reasonable person would also know Hollingsworth was fired after trying to protect Sly and then DGH wanted to put her under Shaw Hillman.

HOLLINGSWORTH ISSUES

As discussed at points above we believe a jury question exists which makes discrete acts Hollingsworth alleged material adverse actions. Moreover, she has been engaged in opposition activity <u>before</u> she filed her December 2017 EEO complaint. The Supreme Court in *Crawford v. Metropolitan Government of Nashville,* 555 U.S. 271, 277 (2009) discussed opposition and said "we would call it opposition if an employee took a stand against an employer's discriminatory practices not by "instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker, for discriminatory reasons." In Hollingsworth's case that is what happened. She does not also have to use explicit language. Exhibit B is a part of the EEOC Questions and Answers Enforcement Guidance on Retaliation and Related Issues, EEOV-NVTA-2016-5 (August 26, 2016).[15] The relevant section states:

> 5.What does it mean to "oppose" conduct made unlawful by an EEO law? Employers must not retaliate against an individual for "opposing" a perceived unlawful EEO practice. This means that an employer must not punish an applicant or employee for *Communicating opposition to a perceived EEOI violation.* For example, it is unlawful to retaliate against an applicant or employee for:

---

[15] These are the part of the current version (applicable in 2016) of what the Supreme Court cited with approval in *Crawford* at 276.

- Refusing to obey an order reasonably *believed* to be discriminatory;
- Resisting sexual advances *or intervening to protect others*;
- *Passive resistance* (allowing others to express opposition);

Opposition can be protected even if it is informal or does not include the words "harassment," "discrimination," or other legal terminology. *A communication or act is protected opposition as long as the circumstances show that the individual is conveying resistance to a perceived potential EEO violation.*

The protection for opposition is limited to those individuals who act with a reasonable good faith belief that the conduct opposed is unlawful or could become unlawful if repeated. *In the EEOC's view, it can be reasonable to complain about behavior that is not yet legally harassment (i.e., even if the mistreatment has not yet become severe and pervasive). It is also reasonable for an employee to believe that conduct violates the EEO laws if the EEOC has adopted that interpretation, even if some courts disagree with the EEOC on the issue.*

For federal employees, the VA Office of Resolution Management (ORM) is in charge of investigating employees EEO complaints. It relies on the definition of what constitutes opposition to discrimination used by the Equal Employment Opportunity Commission (EEOC). ORM's Director Harvey Johnson testified concerning that definition in a case against Defendant in Washington D.C. Ex.C(p.45:1-21). The definition is set forth in the Office of Employment Discrimination Complaint Adjudication Guidelines (Ex.D) and it does not require telling management they are discriminatory. The Guidance states that complaints of retaliation for prior EEO activity can include prior EEO activity that involves "some other activity in opposition to unlawful discrimination" defining opposition as:

" ... "Opposition" activity encompasses protests, demonstrations, or· other forms of verbal or <u>non-verbal</u> opposition <u>to actions or conduct believed in good faith</u> to be discriminatory, including discrimination against persons other than the complainant. The opposition activity must be lawful and <u>reasonable</u>; -i.e., it must not be destructive of social or business interests, or otherwise jeopardize a stable and productive work environment. To be protected, the complainant must have a reasonable, good-faith belief that

the practice being opposed is unlawful. As long as the belief is reasonable, Title VII protections will apply, even if the practice being opposed ultimately proves to be lawful."[16]

The Eleventh Circuit's Standard Jury Instructions 4.22 do not require more. What matters is that management realizes the employee is opposing its actions. The opposition must be made based upon a good faith belief the employee is opposing discrimination and done in an allowable manner. The Eleventh Circuit Pattern Jury Instruction 4.22 on opposition requires a good faith reasonable belief that the employer was engaged in unlawful employment practices. Neither the EEO nor the Eleventh Circuit instruction (explanation first element) require Hollingsworth to tell DGH or Brown, the very people Sly has already filed EEO complaints against for race and EEO activity discrimination, that either her HWE or her opposition to Sly's reassignment under Wendy Shaw-Hillman was due to race or retaliation even though she testified she believed that to be the case. Dkt.71-10p85/136(p.95:13-16)(different treatment from race);p.98/136(p.146:12-148:21) (retaliation-Rosa had EEO activity), but was unclear (also a jury question,) if she specifically used the words race or retaliation. As long as Hollingsworth's conduct can be found by a jury to implicitly be good faith oppositional conduct that should be enough. There is clearly a reasonable basis for a jury to find she had a good faith belief she was opposing racial discrimination and retaliation. She did something in November 2016 which caused an action she believed

---

[16] In a retaliatory work environment, if it did, managers would benefit in retaliating to reduce opposition they perceived is, or will be, occurring and it would lessen the likelihood of others refusing to assist in opposing discrimination.

was based on that, not to be taken. A jury can decide if Brown or DGH would have stopped it if Hollingsworth had not objected. Regardless, we know Hollingsworth made this an issue for DGH and Brown. Hollingsworth opposed discrimination or retaliation. Bronner later told Brown that Hollingsworth felt harassed and may file an EEO. Bronner did that on before Hollingsworth met Brown. Dkt.71-5p.96¶14. The actions which followed need to assessed against all the circumstances.

## DISCRETE ACTS

The discrete acts analysis on pages 30 – 31 of the Order does not follow *Monaghan, Babb v. Sec'y* and *Burlington Northern* by looking at all of the surrounding circumstances to decide whether a reasonable employee would have been deterred from engaging in EEO activity by the conduct alleged in the discrete acts which the Court rejected in this case.[17] *Burlington Northern* recognizes that a reasonable employee standard requires one to consider circumstances. The problem with the Government's arguments and the Court's Order is they do not consider the context and circumstances in violation of *Burlington Northern, Crawford v. Carroll* and *Monaghan*. They also do not

---

[17] For example, once Sly and Bowman describe where a PIP can go, a jury might well see its seriousness. A PIP is recognized as separate prohibited personnel practice because it is a step in a process which can lead to discipline or loss of duties by an employee. *Gonzales v. Dep't of Housing and Urban Development*, 64 M.S.P.R. 314, 319 (September 21, 1994); *New Castle v. Dep't of Treasury*, 94 M.S.P.R. 242, 245 (September 12, 2013). A HWE is too. *Savage v. Department of the Army*, 122 M.S.P.R. 615, 625 (2015). Thankfully, Bowman realized the PIP was improper and quickly removed it. If an employee knows that one of the consequences of engaging in EEO activity is that you can be improperly placed on a PIP; cause you to be embarrassed in front of your subordinates; required to perform many menial jobs; have your keys publicly taken away from you in a fashion that signals you are responsible for missing requests, and other actions, that may well dissuade a reasonable employee from engaging in EEO activity. These and many others are factual issues for a jury. They should be laid out in a trial before being jettisoned.

consider the Plaintiffs' evidence and theory of the case in violation of *Tolan v. Cotton*, 572 U.S. 650 (2014) (vacating the Fifth Circuit's affirmance of summary judgment "the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion."). The Order is in error.

The MSPB broadly construes what can constitute a personnel action, and does not view the list of personal actions at 5 U.S.C. §2302(a)(2)(A) to be exhaustive.[18] *See, e.g., Carter v. Dept. of the Army,* 62 M.S.P.R. 393, 398 (1994). While neither the Board nor the Federal Circuit has yet offered a quantitative or qualitative test for the degree of significance in changes in working conditions that is required for § 2302(a)(2)(A)(xii), some cases are instructive. *Savage v. Department of the Army*, 122 M.S.P.R. 612, 627 (2015). (While the Board's case law under the WPEA does not provide a quantitative or qualitative test for what constitutes 'any other significant change in duties, responsibilities, or working conditions, 'the Board has held that this particular provision should be construed broadly.). Numerous agency actions may amount to a covered "significant change in working conditions" collectively even if

---

[18] "Personnel action" is defined in 5 U.S.C. §2302(a)(2)(A) as: (i) an appointment; (ii) a promotion; (iii) an action under chapter 75 of title 5, United States Code or other disciplinary or corrective action; (iv) a detail, transfer, or reassignment; (v) a reinstatement; (vi) a restoration; (vii) a reemployment; (viii) a performance evaluation under chapter 43 of this title or under title 38; (ix) a decision concerning pay, benefits, or awards or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph; (x) a decision to order psychiatric testing or examination; (xi) the implementation or enforcement of any nondisclosure policy, form, or agreement; and (xii) any other significant change in duties, responsibilities, or working conditions.

they are not covered personnel actions individually. *Holderfield v. Merit Systems Protection Board,* 326 F.3d 1207, 1209–10 (Fed.Cir.2003). Administrative Judges routinely find that removal or diminishment of supervisory duties are personnel actions. *See e.g., Floyd, Dr. Karon L. v. Dept. of Homeland Sec.*, PH-1221-16-0346-W-1, 2018 WL 3015481 (MSPB June 14, 2018) ("Dr. Barrett's decision to diminish the appellant's supervisory duties constitutes a personnel action under § 2302(a)(2)(A)(xii), which concerns 'any other significant change in duties, responsibilities, or working conditions."); *See Ingram v. Department of the Army*, 116 M.S.P.R. 525, 531 (2011) (significant change when manager stopped assigning work to the employee); *Mattil*, 118 M.S.P.R. at 672 (directing an appellant to work from home rather than in the agency's offices, denying an appellant access to agency computers, phones, resources, and offices, and excluding an appellant from communications related to ongoing events in which he was involved is a significant change in working conditions); *Hodge, Audrey M. v. Dept. of Veterans Affairs*, AT-1221-19-0040-W-1, 2020 WL 1852856 MSPB Apr. 6, 2020) ("Assigning the appellant Dr. Ginjipalli's supervisory duties over Home-Based Primary Care qualifies as significant change in the appellant's duties and responsibilities, especially because the appellant testified, without contradiction, that she had to work considerable extra hours in order to cover her regular and additional duties."). In *Special Counsel v. Harvey*, 28 MSPR 595, 601 (1984), (reversed on other grounds by *Harvey v. MSPB*, 802 F.2d 537 (D.C. Cir. 1986)) deliberate idling of an SES changed his status from a functioning employee with duties and subordinates to a supernumerary. This was a significant change in duties

inconsistent with Gorsey's salary and grade level, (a personnel action). *Sistek v. Dep't of Veterans Affairs*, 955 F.3d 948, 955 (Fed. Cir. 2020). *Rice v. USDA*, 97 MSPR 501, 508 (2004), (by characterizing the announcement of the vacancy as an announcement to fill his position, [something DGH did to Hollingsworth ¶71d] he implied that he would no longer be performing those duties when he returned to his position of record at the end of his detail.).

Based on this case law and the facts the HWE and discrete acts are questions for the jury. Section 2302(a)(2)(A)(xii) covers: ¶'s46,49,63,66,67[19],68,74a,b[20],d,e and g. Several could be covered by an informal action under (iv). ¶71f is covered by (iii) and (xii). Subsection (iii) covers ¶'s76a,b,c,¶76b,g covered by *Sistek.* 5 U.S.C §2302(a)(2)(A)(viii) covers ¶55, ¶63 and 63 is also covered by (xii) because undermined Sly's ability as a supervisor to perform her duties and responsibilities which included all aspects of ROI including preserving the safety of requests (xii). ¶64, 74f is a discrete act especially in a retaliation context. *Varnado v. Mukasey*, No.08-61331, 2010

---

[19] ¶66 can be (xii) and (iii). As to ¶67 a letter of warning has been treated as personnel action under §2302 in *Davis v. Dept. of Def.*, 301 Fed. Appx. 968, 971 (Fed. Cir. 2008)(unpublished) - Under 29 C.F.R. §1614.107(a)(5) -- when the complaint alleges that the proposal or preliminary step to taking a personnel action is retaliatory, as Complainant has alleged, it should not be dismissed. The issuance of proposed disciplinary action like this, even if not finalized, can state a viable claim of retaliation because it is an action that could dissuade a reasonable employee from making or supporting a charge of discrimination. See *EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004 (August 25, 2016); *Carroll v. Department of the Army*, EEOC Request No. 05970939 (April 4, 2000). See also, *Burlington Northern & Santa Fe Railroad. Co. v. White*, 548 U. S. 53, 126 S. Ct. 2405 (2006) (the anti-retaliation provisions of the employment discrimination statutes seek to prevent an employer from interfering with an employee's efforts to secure or advance enforcement of the statutes' basic guarantees and are not limited to actions affecting employment terms and conditions).
[20] On April 24, 2017, DGH directed the complainant to allow students to use her PIV badge to scan documents which forced her to either violate order by a supervisor or violate her responsibilities under VA rules requiring not to do that.

WL2196263 at *2 (S.D. Fla. June 1, 2010) (biased evaluation, placement on performance improvement plan, and failure to promote were all discreet acts of discrimination). ¶71e is also covered by (ix) because the VA deducted or benefits, she didn't receive because the military already deducted for those benefits while on leave. ¶71d falls with (viii).

WHEREFORE, Plaintiffs have provided sufficient evidence for a jury to decide liability under 42 U.S.C. §2000e-16(a) which requires that Plaintiffs prove retaliation or race was a part of, or consideration in, the decision-making process. Under the *Mt. Healthy* framework, the Defendant has the burden to establish it would have made the same decision(s) anyway, not to avoid liability, but in order to limit Plaintiffs' remedy to injunction and prospective relief. While it is submitted the Government cannot do that, it is clear it has failed to even address that. Similarly, the Eleventh Circuit now rejects the severe and pervasive standard and requires the original *Burlington Northern* principles to be applied to both the discrete acts and the HWE claim. Failure to do either is clear error.

Again, it is respectfully submitted that the material issues are jury questions and require denial of the MSJ.

Respectfully submitted,

*/s/ Joseph D. Magri*
Joseph D. Magri
Florida Bar No. 0814490
Merkle & Magri, P.A.
5601 Mariner Street, Suite 400
Tampa, FL 33096
Tel: (813) 281-9000

Fax: (813) 281-2223
Email: jmagri@merklemagri.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 20, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the following CM/ECF participant:

KARIN HOPPMANN
Acting United States Attorney
Scott H. Park
Assistant United States Attorney
Julie R. Posterado
Assistant United States Attorney
Identifying No. USA 084
400 W. Washington, Street, Suite 3100
Orlando, FL 32801
Telephone: (407) 648-7543
Facsimile: (407) 648-7588
Email: Scott.Park@usdoj.gov
Email: Julie.Posterado@usdoj.gov

*/s/ Joseph D. Magri*
Joseph D. Magri