## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ROSA SLY and**
**DEVONA HOLLINGSWORTH,**

             **Plaintiffs,**

**v.**                                                        **Case No. 8:17-cv-1868-AAS**

**SECRETARY, DEPARTMENT OF**
**VETERANS AFFAIRS,**

             **Defendant.**
_____/

## ORDER

The Secretary of the Department of Veterans Affairs (Secretary) moves

for reconsideration of this court's prior order (Doc. 87) granting in part and

denying in part the Secretary's motion for summary judgment (Doc. 65). (Doc.

125). The plaintiffs respond. (Doc. 130).

## I.    LEGAL STANDARD

District courts have "inherent authority to revise interlocutory orders

before the entry of judgment adjudicating all the claims and rights and

liabilities of all the parties in a case." *Hollander v. Wolf*, No. 9:09-cv-80587-

KLR, 2009 WL 10667896, at *1 (S.D. Fla. Nov. 17, 2009). These limited

circumstances prompt reconsideration of a court order: (1) an intervening

change in the controlling law; (2) new evidence which has become available; or

(3) a need to correct clear error or prevent manifest injustice. *McGuire v.*

*Ryland Group, Inc.*, 497 F. Supp. 2d 1356, 1358 (M.D. Fla. 2007); *True v. Comm'r of the I.R.S.*, 108 F. Supp. 2d 1361, 1365, (M.D. Fla. 2000).

The party moving for reconsideration must present "facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *McGuire*, 497 F. Supp. 2d at 1358 (internal quotations omitted). "This ordinarily requires a showing of clear and obvious error where the interests of justice demand correction." *Id.* (internal quotations omitted).

An order granting summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A moving party is entitled to summary judgment when the nonmoving party fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 316, 323 (1986). The nonmoving party must "go beyond the pleadings and her own affidavits," and she must point to evidence in the record that demonstrates the existence of a genuine issue for trial. *Id.*

If evidence requires credibility determinations or deciding factual inferences in the moving party's favor, summary judgment is inappropriate because the duty to weigh credibility and evidence belongs to the jury when

the judge is not the factfinder. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (quotation and citation omitted). Further, all record evidence is reviewed with inferences construed in the nonmoving party's favor. *Id.* at 1192–93 (citation omitted).

## II.   BACKGROUND

### A.   Procedural History

In the initial complaint, Ms. Sly sued the Secretary for retaliation, harassment and hostile work environment, and race discrimination under Title VII. (Doc. 1). The Secretary answered and asserted affirmative defenses. (Doc. 15). Ms. Sly successfully sought leave to file an amended complaint to add Ms. Hollingsworth as a plaintiff. (Docs. 22, 25). In the first amended complaint, Ms. Hollingsworth sued the Secretary for the same claims as Ms. Sly. (Doc. 26). Again, the Secretary answered and asserted affirmative defenses. (Doc. 29).

Because of information in discovery, Ms. Sly and Ms. Hollingsworth successfully sought leave to file a second amended complaint, which the Secretary answered and asserted affirmative defenses. (Docs. 50, 51, 52, 53). The Secretary moved for summary judgment on every claim that Ms. Sly and Ms. Hollingsworth alleged. (Doc. 65). Ms. Sly and Ms. Hollingsworth opposed the motion. (Doc. 71). The Secretary replied. (Doc. 73, 74, 75). Ms. Sly and Ms. Hollingsworth filed a sur-reply. (Docs. 76, 77, 78).

Ms. Sly and Ms. Hollingsworth successfully sought leave to file a third amended complaint.[1]  (Doc. 79, 80, 82, 83).  Because Ms. Sly added a new fact related to her claims, the court allowed the Secretary to file a supplemental brief to address this new fact and allowed Ms. Sly to respond to the Secretary's supplemental brief.  (Doc. 82).  Both parties provided supplemental briefs.  (Docs. 85, 86).

This court granted in part the Secretary's motion for summary judgment (Doc. 65) on March 24, 2020. (Doc. 87). This court ordered further briefing on the Secretary's motion for summary judgment to consider intervening case law from the Supreme Court and Eleventh Circuit. (Docs. 97, 122).

## B.    Statement of Facts[2]

Since 1980, Ms. Sly, who is Black, has worked at the Bay Pines VA Medical Center.  (Doc. 65, Ex. A, 6:24–7:1; Doc. 83, ¶ 3, 95).  Since 2004, Ms.

---

[1] Again, the Secretary answered and asserted affirmative defenses.  (Doc. 84).

[2] Because this order reevaluates the Secretary's motion for summary judgment, this order reincorporates the statement of facts from its prior order. (Doc. 87, pp. 3–16). When ruling on a motion for summary judgment, reasonable inferences are drawn in the nonmoving party's favor and evidence favorable to the moving party that the jury need not believe is disregarded.  *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004) (discussing judgment as a matter of law); *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986) (stating the standard for summary judgment mirrors the standard for directed verdict).  As a result, this order's "Background" includes reasonable inferences in Ms. Sly's and Ms. Hollingsworth's favor and disregards evidence favorable to the Secretary that a jury need not believe.

Sly has been the supervisor of the Release of Information (ROI)[3] section in the Business Office Service (BOS) at Bay Pines.  (Doc. 65, ¶ 1; Doc. 65, Ex. A, 9:7–8). After settling a prior Equal Employment Opportunity (EEO) complaint, Ms. Sly was promoted from a GS-9 to a GS-11 and made the alternate chief of the Records Management Section.  (Doc. 65, Ex. A, 12:20–16:21).

Ms. Hollingsworth is also Black. (Doc. 83, ¶ 95). Ms. Hollingsworth worked as the Assistant Chief of Health Information Management System (HIMS)[4] from October 3, 2016 to July 24, 2017.  (Doc. 65, Ex. A, 31:23–32:1; Doc. 65, Ex. A-16, pp. 316–17; *see also* Doc. 65, ¶ 3). Ms. Hollingsworth is a Master Sergeant in the United States Air Forces Reserves. (Doc. 83, ¶ 3).

Ms. Wendy Shaw-Hillman, who is Caucasian (Doc. 65, Ex. M, ¶ 9), was the supervisor for the ROI in the Lee County Outpatient Clinic for Bay Pines (Doc. 65, Ex. E, 5:1–7).  Ms. Shaw-Hillman supervised medical records, ROI, and coding.  (Doc. 65, Ex. E, 5:6–7).  Since February 2018, she is the Privacy Act Officer for Lee County.  (Doc. 65, Ex. E, 4:14–21).

Ms. Donna Griffin-Hall, who is African-American (Doc. 65, Ex. C, 33:18–20), started at Bay Pines as the Chief of Health Administrative Service in 2007

---

[3] The ROI section handles requests by veterans and others, such as lawyers or government agencies, for the release of medical records.  (Doc. 65, ¶ 1).

[4] HIMS is a section in the BOS and includes ROI, coding, and medical records and scanning.  (Doc. 65, ¶ 3).

(Doc. 65, Ex. C, 4:15–16).  After settling a prior EEO complaint, Ms. Griffin-Hall received the position of Chief of BOS at Bay Pines.  (Doc. 65, Ex. C, 18:8–9:10).  Ms. Griffin-Hall was the service chief of Ms. Sly, Ms. Hollingsworth, and Ms. Shaw-Hillman.  (Doc. 83, ¶ 5).

Ms. Kristine Brown, who goes by Kris Brown, was the Associate Director of Bay Pines from December 2009 to October 2017.  (Doc. 65, Ex. D, 5:21–6:9).  Since October 2017, Ms. Brown has been the Deputy Director of Bay Pines.  (Doc. 65, Ex. D, 6:9–11; *see also* Doc. 65, ¶7).  She is the direct supervisor of Ms. Griffin-Hall.  (Doc. 65, Ex. D, 7:16–22).

Although Ms. Griffin-Hall is at the center of the claims, Ms. Sly and Ms. Hollingsworth identify separate and distinct events as the basis for their claims.  Thus, this order will review the facts for each separately.

### 1.    Ms. Sly

To better understand the facts related to the specific events and claims presented by Ms. Sly, a discussion follows about the general background information related to ROI's backlog and missing requests, Ms. Sly's EEO complaints, and the discrete acts Ms. Sly allege form the basis of her claims.

### a.    Background on ROI's Backlog and Missing Requests

When Ms. Griffin-Hall became Chief of BOS in June 2014, ROI had a

backlog in processing requests.[5]  (Doc. 65; Ex. M, ¶ 5; *see also* Doc. 65, Ex. L-1).  Although there is no data before October 2014, a supervisory email string reported the ROI had a backlog of 580 requests in August 2014.  (Doc. 71, Ex. 25, p. 12, n. 57).  In a later VA Office of the Inspector General report, the average number of requests pending over twenty days between October 2014 and May 2016 was 2,454.[6]  (Doc. 71, Ex. 25, p. 12).

The Privacy Office[7] audited ROI from October to December 2014 and discovered requests, which contain personal information, were missing and posed a privacy breach.  (Doc. 65, Ex. I, ¶ 3).  The Privacy Office sent a memo detailing the findings of the audit, which included forty-seven missing requests.  (Doc. 65, Ex. I-2).  On March 27, 2015, the Privacy Office issued a formal privacy violation memo identifying twelve requests remained missing.  (Doc. 65. Ex. I-3, p. 1605).

Over the next several months, BOS continued to have a problem with missing requests, and the Privacy Office issued four formal privacy violation memos between April 29, 2015 to May 22, 2015.  (Doc. 65, Ex. I-3, pp. 1598–

---

[5] A request for release of information is to be processed within twenty days, and a request pending longer is in backlog.  (Doc. 65, Ex. G, 52:11–19).

[6] This number was the average, but the report shows the backlog increased to 3,423 requests pending longer than twenty days in April 2016.  (Doc. 71, Ex. 25, p. 12).

[7] The Privacy Office conducts quarterly audits at Bay Pines and outpatient clinics to ensure privacy compliance related to protected health information.  (Doc. 65, Ex. I, ¶ 3).

1604).  These memos reflect 143 missing requests.  (Doc. 65, Ex. I-3, pp. 1598–1604).  On May 22, 2015, Ms. Griffin-Hall prepared an internal memo and set up meetings every other week with Ms. Sly to address how to improve ROI, including developing action plans and Standard Operating Procedures.  (Doc. 65, Ex. J, ¶ 15; *see also* Doc. 65, Ex. J-9).

The problem with the missing requests in ROI continued throughout 2015 and into 2016, with the Privacy Office issuing four more formal privacy violation memos identifying 107 additional missing requests.  (Doc. 65, Ex. I-3, pp. 1589–97).  On June 21, 2016, BOS notified the Privacy Office there were potentially 386 missing requests received between January 2014 to March 2016.  (Doc. 65, Ex. I-3, pp. 1606–08).

After processing, incoming requests were locked in a secured room in the ROI area at Bay Pines.  (Doc. 65, Ex. A, 158:17–19).  Because of the missing requests, Ms. Griffin-Hall required Ms. Sly and Ms. Loria Royer, the lead in ROI, to turn in their keys to the secured room.  (Doc. 65, Ex. A, 159:2–15; Doc. 65, Ex. G, 26:21–27:12).  This left only Ms. Griffin-Hall and Ms. Patricia Bowman[8] with access to the room.  (Doc. 65, Ex. J, ¶ 18; *see also* Doc. 65, Ex. A, 164:15–16).  Additionally, in June and July 2016, Ms. Shaw-Hillman came

---

[8] Ms. Bowman was the Chief of HIMS between October 2015 and January 2017.  (Doc. 83, ¶ 5).  She was the immediate supervisor of Ms. Sly and Ms. Hollingsworth, and Ms. Griffin-Hall was Ms. Bowman's supervisor.  (*Id.*).

to Bay Pines to assist in the search for the missing requests.  (Doc. 65, Ex. E, 31:21–32:5).  Ultimately, some missing requests were in employees' desks and the secured room, but Ms. Shaw-Hillman also determined 400 other requests were never logged.  (Doc. 65, Ex. E, 117:8–15; Doc. 65, Ex. Q, 43:14–18).  Ms. Shaw-Hillman also provided a detailed report of her observations and recommended changes for the Bay Pines ROI to help fix the backlog and missing requests issues.  (Doc. 65, Ex. E, Pl. Ex. 1).

On July 14, 2016, the Privacy Office determined BOS was in serious noncompliance with protecting the VA's sensitive information, and the Chief of BOS, Ms. Griffin-Hall, determined Ms. Sly was responsible for those events.  (Doc. 65, Ex. I-3, p. 1607).  The Privacy Office deferred to BOS to address these issues and gave BOS one week to submit a corrective action plan.  (Doc. 65, Ex. I-3, p. 1607).  Because of the backlog and missing requests, the VA Office of Inspector General investigated the ROI program at Bay Pines.  (Doc. 65, Ex. S, Tab 28).  The report confirmed ROI could not find 547 hard copy requests submitted from January 2014 through June 2016.  (Doc. 71, Ex. 25, p. 22).

**b.    EEO Activity[9]**

Around 2008, Ms. Sly filed an EEO Complaint against Mr. Jason

---

[9] Because some of Ms. Sly's alleged discrete acts occur before her first EEO complaint against Ms. Griffin-Hall, this section includes all of Ms. Sly's EEO complaints or activity beginning when she received a pay grade increase.

Waldrop, former Chief of BOS, alleging race discrimination because she did not receive a promotion to privacy officer. (Doc. 65, Ex. A, 12:20–15:9). The EEO complaint settled, and Ms. Sly was promoted to a GS-11 and made the alternate records manager. (Doc. 65, Ex. A, 15:23–16:6). In July 2015, Ms. Sly provided an affidavit for Ms. Mary Mells' employment discrimination litigation against the VA. (Doc. 65, Ex. A, 27:12; *see also* Doc. 65, Ex. A-5).

On June 24, 2015, Ms. Sly filed an EEO complaint against Ms. Griffin-Hall for retaliation in response to Ms. Sly's affidavit in Ms. Mells's litigation. (Doc. 65, Ex. A-1). On August 15, 2016, Ms. Sly filed an EEO complaint against Ms. Griffin-Hall alleging retaliation and race discrimination including various actions such as a performance improvement plan and July 2016 privacy violation memo. (Doc. 65, Exs. A-2, A-3). On June 2, 2017, Ms. Sly filed an EEO complaint against Ms. Griffin-Hall for retaliation based on hostile work environment. (Doc. 65, Ex. A-28). On January 3, 2019, she filed an EEO complaint alleging race discrimination and retaliation related to an October 2018 reprimand and Notice of Proposed Suspension. (Doc. 65, Ex. A-29).

### c.   Discrete Acts Alleged in the Third Amended Complaint

As noted above, the settlement of Ms. Sly's 2008 EEO complaint included that she was made the alternate records manager. (Doc. 65, Ex. A, 16:5–23). After John Accetta, the primary records manager, retired in 2014, Ms. Sly

devoted substantial time to supplemental duties but received no training despite asking Ms. Brown and Ms. Griffin-Hall for training.  (Doc. 83, ¶ 46).

In April 2015, Ms. Griffin-Hall orally removed Ms. Sly's supervisory duties and required her to perform staff level duties of processing 25-50 medical records weekly.  (*Id.* at ¶ 49).  On May 14, 2015, Ms. Griffin-Hall sent Ms. Sly an email stating Ms. Sly was to "assist with closing out requests on a daily basis and provide an attachment of Ms. Sly's current productivity."  (*Id.*; *see also* Doc. 65, Ex. 8, p. 99).  Ms. Griffin-Hall instructed the staff to take messages on incoming calls, which interfered with Ms. Sly's supervisory duties to handle those calls.  (Doc. 83, ¶ 49).

On November 13, 2015, Ms. Sly alleges she received her FY-2015 performance appraisal with an overall rating of "fully successful."  (*Id.* at ¶ 55; *see also* Doc. 65, Ex. A-30).  Ms. Sly received no counseling about her performance at the mid-year progress review in June 2015.  (Doc. 83, ¶ 55; *see also* Doc. 65, Ex. A-30).  Ms. Sly previously received an "outstanding" rating, and a "fully successful" rating affected Ms. Sly's ability to receive a performance bonus.  (Doc. 65, Ex. A, 281:11–282:12; Doc. 65, Ex. S, Tab 2 (including 2013-2014 performance review with an "outstanding" rating)).

On June 27, 2016, Ms. Griffin-Hall limited Ms. Sly's access to the storage room for ROI requests unless Ms. Griffin-Hall or Ms. Bowman approved Ms. Sly's access.  (Doc. 83, ¶ 63; Doc. 65, Ex. A, 158:6–164:9; *see also* Doc. 65, Ex.

J-19).

On June 29, 2016, Ms. Bowman at the direction of Ms. Griffin-Hall issued Ms. Sly a Performance Improvement Plan (PIP). (Doc. 83, ¶ 64; *see also* Doc. 65, Ex. A-20). The PIP stated Ms. Sly's performance of her duties in the critical elements of leading change, leading people, business acumen, and results drive is unacceptable. (Doc. 65, Ex. A-20). Ms. Sly had 90 days to show acceptable performance, and if she did not meet the requirements, Ms. Sly could be demoted or removed from federal service. (Doc. 65, Ex. A-20). On September 30, 2016, Ms. Sly successfully completed the PIP. (Doc. 65, Ex. A-22).

On July 14, 2016, the Privacy Office issued a privacy violation memo identifying several missing requests and found Ms. Sly in violation for those missing requests. (Doc. 83, ¶ 67). The Privacy Office does not take disciplinary action against employees for privacy violations; rather, any disciplinary action is left to the discretion of the service involved in the privacy breach. (Doc. 65, Ex. I, ¶ 9). Ms. Sly alleges Ms. Griffin-Hall unfairly criticized Ms. Sly for procedures Ms. Griffin-Hall instituted over Ms. Sly's objections. (Doc. 83, ¶ 66). Because Ms. Griffin-Hall provided work directly to the employees, Ms. Sly could not keep track of those requests, hindering her ability to supervise employees. (*Id.*).

On November 25, 2016, Ms. Griffin-Hall drafted a memo stating the ROI

12

would be aligned and report to the Lee County Healthcare Center Manager—Ms. Shaw-Hillman. (Doc. 83, ¶ 68; *see also* Doc. 65, Ex. B-4). The change would become effective on November 28, 2016. (Doc. 65, Ex. B-4). Ms. Sly was on personal leave when Ms. Griffin-Hall drafted the memo. (Doc. 65, Ex. B, 78:8). When Ms. Sly returned and heard about the realignment, Ms. Sly did not discuss the realignment with anyone. (Doc. 65, Ex. A, 197:13–198:1). This realignment never occurred because of potential issues related to the pay classifications of Ms. Sly and Ms. Shaw-Hillman. (Doc. 65, Ex. B-7; *see also* Doc. 65, Ex. A, 196:21–197:12).

From April 17, 2017 to May 25, 2017, Ms. Griffin-Hall sent emails saying Ms. Sly could not lead her department, saying Ms. Sly needed to be a mentor to her staff, and reassigning Ms. Sly from her supervisory duties instead to process requests at the front desk. (Doc. 83, ¶ 74a; *see also* Doc. 65, Ex. A-28). On April 24, 2017, Ms. Griffin-Hall directed Ms. Sly to allow students to use Ms. Sly's employee badge to scan documents. (Doc. 83, ¶ 74b; *see also* Doc. 65, Ex. A, 245:1–6 (stating no student used her badge)). On May 31, 2017, Ms. Griffin-Hall directed Ms. Sly to audit her entire staff, even though this was typically a responsibility of the lead technologists. (Doc. 83, ¶ 74d; *see also* Doc. 65, Ex. A, 106:4–11). On the same day, Ms. Griffin-Hall directed Ms. Sly to work the front desk processing Freedom of Information Act requests in addition to her supervisory duties. (Doc. 83, ¶74e; *see also* Doc. 71, Ex. E-4, ¶

e).  On August 31, 3017, Ms. Griffin-Hall provided a mid-term evaluation—which should have been done in March—that Ms. Sly's "performance needed improvement to be fully satisfactory."  (Doc. 83, ¶ 74f).

One year later, in September 2018, Ms. Griffin-Hall met with Ms. Sly to discuss the deficiency in the validation worksheets Ms. Griffin-Hall received from Ms. Sly.  (Doc. 65, Ex. J, ¶ 19; Doc. 65, Ex. J-14).  According to Ms. Griffin-Hall, Ms. Sly failed to follow instructions by not documenting that she followed the validation process under the Standard Operating Procedure Ms. Sly signed on January 10, 2018.  (Doc. 65, Ex. A-37).  As a result, on October 16, 2018, Ms. Griffin-Hall issued Ms. Sly a Letter of Reprimand.  (Doc. 65, Ex. A-31).  Ms. Sly filed a grievance challenging the October 2018 reprimand but ultimately withdrew it (Doc. 65, Ex. K, ¶ 4), and Ms. Griffin-Hall imposed the reprimand in January 2019 (Doc. 83, ¶ 76a).

On January 7, 2019, Ms. Griffin-Hall issued a Notice of Proposed Seven-Day Suspension.  (Doc. 83, ¶ 76b; *see also* Doc. 65, Ex. A, 283:18–21; Doc. 65, Ex. J-15).  The proposed suspension was based on two charges: (1) failure to provide supervisory oversight related to the backlog of ROI requests; and (2) failure to safeguard confidential information based on the unaccounted missing ROI requests.  (Doc. 65, Ex. A-35).  The proposed suspension would suspend Ms. Sly from duty and pay for seven calendar days and gave Ms. Sly a right of reply to Ms. Brown, who would make the final decision.  (Doc. 65, Ex.

A-35).  Ms. Sly provided a written rebuttal (Doc. 65, Ex. A, 283:24–284:6) and an oral response (Doc. 85, Ms. Brown Supplemental Declaration, ¶ 8).

Based on the information in the evidence file and Ms. Sly's responses, Ms. Brown lowered the proposed suspension to a reprimand.[10]  (Doc. 85, Ms. Brown Supplemental Declaration, ¶ 8).  Ms. Brown found the evidence did not support the charge of failure to provide supervisory oversight.  (Doc. 85, Ms. Brown Supplemental Declaration, ¶ 8).  But Ms. Brown found the evidence supported the charge of failure to safeguard confidential information based on the VA Office of Inspector General report.  (Doc. 85, Ms. Brown Supplemental Declaration, ¶ 9).

### 2.    Ms. Hollingsworth

Ms. Bowman hired Ms. Hollingsworth as the Assistant Chief of HIMS, starting October 3, 2016 subject to a one-year probationary period.  (Doc. 65, Ex. B-16, p. 316).

On November 17, 2016, approximately six weeks after Ms. Hollingsworth started, Ms. Griffin-Hall sent a memo to Ms. Hollingsworth expressing concerns about Ms. Hollingsworth's communication based on feedback received from the BOS staff.  (Doc. 65, Ex. B-3, ¶ 1).  Ms. Griffin-Hall expected Ms. Hollingsworth to communicate in a respectful manner, comply

---

[10] Ms. Griffin-Hall also received a reprimand based on the same VA Office of Inspector General report.  (Doc. 85, Ms. Brown Supplemental Declaration, ¶ 9).

with guidance as given, and understand and apply the processes and procedures within the VA. (Doc. 65, Ex. B-3, ¶ 3). Before issuing the memo, Ms. Griffin-Hall contacted Taren Savage, Human Resources Specialist at Bay Pines, about Ms. Hollingsworth's conduct. (Doc. 65, Ex. O, 77:25–78:6). Ms. Savage advised Ms. Griffin-Hall to terminate Ms. Hollingsworth, but Ms. Griffin-Hall wanted to give Ms. Hollingsworth a chance and issued the memo. (Doc. 65, Ex. O, 78:24–80:1).

In November 2016, Ms. Griffin-Hall proposed to realign the ROI at Bay Pines under Lee County, and Ms. Hollingsworth opposed the change, expressed her concerns about distributing the memo, and ultimately did not distribute the memo. (Doc. 65, Ex. B-7). On November 30, 2016, Ms. Hollingsworth emailed the union about a veteran's need for alternative work schedule, but Ms. Hollingsworth used the wrong form. (Doc. 65, Ex. N, 220:13–221:9). Ms. Griffin-Hall requested Ms. Hollingsworth resend the email, but Ms. Hollingsworth refused because the union accepted the wrong form. (Doc. 65, Ex. N, 221:10–18). Ms. Hollingsworth's November 30th email also included medical information about the employee in violation of Bay Pines procedures. (Doc. 65, Ex. B-16, p. 323).

In late November 2016, Ms. Hollingsworth made a telephone complaint to the VA Anti-Harassment Office against Ms. Griffin-Hall and the harassing environment Ms. Hollingsworth endured. (Doc. 65, Ex. B-2). Afterwards, Ms.

Brown conducted an inquiry about the allegations with both parties.  (Doc. 65, Ex. B-2).  Ms. Hollingsworth complained about Ms. Griffin-Hall's behavior toward her, including Ms. Griffin-Hall calling Ms. Hollingsworth the baby of the group. (Doc. 65, Ex. B-2).  On December 21, 2016, Ms. Brown recommended the parties address each of their individual grievances face to face in the mediation process.  (Doc. 65, Ex. B-2).

On December 13, 2016, Ms. Griffin-Hall met with Ms. Sly, Ms. Hollingsworth, Ms. Shaw-Hillman, and Marilyn Jackson, a lead from medical records.  (Doc. 65, Ex. B-13).  In that call, a heated exchange occurred between Ms. Hollingsworth and Ms. Griffin-Hall.  (Doc. 65, Ex. O, 34:9–35:8; Doc. 65, Ex. N, 229:5–234:9).  Ms. Hollingsworth felt Ms. Griffin-Hall was being disrespectful and unprofessional.  (Doc. 65, Ex. B-16, p. 352).  After the meeting, Ms. Griffin-Hall informed Ms. Hollingsworth that she thought Ms. Hollingsworth was being disrespectful, and her behavior was inappropriate. (Doc. 65, Ex. N, 233:9–23).

The Secretary asserts on December 20, 2016, Ms. Griffin-Hall submitted a memorandum to Human Resources requesting to terminate Ms. Hollingsworth during her probationary period because Ms. Hollingsworth failed to follow instructions, released medical information without authorization, and otherwise had "conduct unbecoming."  (Doc. 65, Ex. B-16, p. 320).

17

On December 22, 2016, Ms. Hollingsworth contacted an EEO counselor and made an informal complaint of race and age discrimination but did not make a formal complaint on those grounds.  (Doc. 65, Ex. B-1).

Ms. Hollingsworth handled the duties of the Acting Chief of HIMS from November 21, 2016 to January 27, 2017 during Ms. Bowman's extended leave.  (Doc. 71, Ex. HH).  Ms. Hollingsworth continued to handle the duties of the Chief of HIMS because Ms. Bowman left the VA and there was a federal hiring freeze.  (Doc. 65, Ex. B-9).  On January 25, 2017, while Ms. Griffin-Hall was serving in a detailed position in San Diego, Ms. Hollingsworth contacted the Chief of Health Informatics and the Administrative Officer about being temporarily promoted because she was handling the duties of the Chief of HIMS, essentially filling the role as Acting Chief of HIMS.  (Doc. 83, ¶ 71b; *see also* Doc. 65, Ex. B-9, p. 533).  Ms. Hollingsworth's inquiry was discussed with Ms. Griffin-Hall who stated the promotion did not apply to Ms. Hollingsworth's situation because Ms. Hollingsworth was not performing the duties of Chief of HIMS.  (Doc. 65, Ex. B-9, p. 529).  Ms. Griffin-Hall designated no one as the Acting Chief of HIMS, and Ms. Griffin-Hall wished to discuss Ms. Hollingsworth's request more when she returned to Bay Pines.  (Doc. 65, Ex. B-9, p. 529).

On February 1, 2017, Ms. Hollingsworth contacted an EEO counselor to begin the formal EEO complaint process, and on April 13, 2017, she filed a

formal EEO complaint against Ms. Griffin-Hall for retaliation.  (Doc. 65, Ex. B-5).  On August 23, 2017, Ms. Hollingsworth amended her EEO complaint to include her termination.  (Doc. 65, ¶45).

Ms. Hollingsworth was on military leave from February 26, 2017 through March 4, 2017 and then went on vacation until March 12, 2017.  (Doc. 65, Ex. B, 110:25–111:9).  While Ms. Hollingsworth was on military leave, Ms. Griffin-Hall emailed the entire BOS requesting volunteers to serve as the Acting Chief of HIMS, which would include a temporary promotion for thirty-days.  (Doc. 83, ¶ 71d; *see also* Doc. 65, Ex. B-10).  Ms. Hollingsworth started another military leave on March 13, 2017 and did not return to Bay Pines.  (Doc. 65, Ex. B, 112:14–16).

On July 18, 2017, the Chief of Human Resources Service at Bay Pines signed a letter terminating Ms. Hollingsworth during her probation period, effective July 24, 2017.  (Doc. 83, ¶ 71f; *see also* Doc. 65, Ex. B-16, pp. 316–18).  On July 31, 2017, the VA notified Ms. Hollingsworth that she received VA pay for time when she was on military leave and needed to repay the VA.[11]  (Doc. 83, ¶ 71e; *see also* Doc. 65, Ex. B, 122:22–123:16).

## III.   ANALYSIS

Intervening case law published after this court's prior order (Doc. 87) on

---

[11] The VA deducted the amount owed from Ms. Hollingsworth's payout of her annual leave she accrued while at Bay Pines.  (Doc. 65, Ex. B, 124:4–7).

the Secretary's motion for summary judgment demands reconsideration of this court's prior order. To better illustrate the impact of recent jurisprudential changes, this order will briefly summarize this court's prior order before diagramming the relevant recent Supreme Court and Eleventh Circuit decisions. This order will then illustrate the impact these decisions make on the case law undergirding the prior order and reconsider the conclusions of the prior order.

### A.   Summary of the Prior Order

The prior order began by examining whether Ms. Sly and Ms. Hollingsworth had exhausted their administrative remedies before filing suit, a requirement for raising a Title VII employment discrimination claim. (Doc. 87, p. 17) (*citing Brown v. Snow*, 440 F.3d 1259, 1262 (11th Cir. 2006)). The Secretary did not contest that Ms. Sly exhausted the administrative remedies for each of her claims, but did argue Ms. Hollingsworth did not exhaust her administrative remedies for her race discrimination claim. (Doc. 65, pp. 29–30). The prior order agreed with the Secretary, concluding "Ms. Hollingsworth did not allege race discrimination in her formal EEO complaint" and her race discrimination claim was not reasonably related to or expected to grow from her retaliation claim. (Doc. 87, p. 19). Thus, the prior order concluded while Ms. Sly had exhausted administrative remedies for her claims, Ms. Hollingsworth had not for her race discrimination claim. (*Id*.). The prior order

granted the Secretary's motion for summary judgment on Ms. Hollingsworth's race discrimination claim (Count II). (*Id.* at 20).

The prior order then concluded the plaintiffs presented "no direct evidence of retaliatory animus or discriminatory intent." (*Id.* at 23). Thus, the prior order held Ms. Sly and Ms. Hollingsworth had to rely on "circumstantial evidence to support their claims." (*Id.*).

### 1.    Title VII Retaliation

The prior order then turned to the plaintiffs' claims of unlawful retaliation under Title VII. The anti-retaliation provision of Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The prior order applied *Burlington North & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006) in concluding a prima facie retaliation case sufficient to survive a motion for summary judgment requires the plaintiff show: "(1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal link between the protected activity and the adverse action." (Doc. 87, p. 24) (*citing Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2010)).

The prior order then concluded "[t]o prove causation, the plaintiff must show that the decision maker was aware of the protected conduct at the time of the adverse employment action" meaning the "protected activity was a but-for cause of the adverse employment decision." (*Id*.) (internal citations omitted). The prior order then applied the framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973) and concluded "[o]nce the plaintiff establishes a prima facie retaliation case, the burden of production shifts to the defendant to rebut the presumption . . . [i]f the defendant can carry this burden, then the plaintiff must prove that the legitimate reasons offered by the employer for undertaking the adverse employment action were pretextual." (*Id*. at 25) (internal citations omitted). In examining whether the plaintiffs engaged in statutorily protected activity, the prior order noted the protected employment activity "must occur before the challenged personnel action." (*Id*.) (*citing Cormack v. N. Broward Hosp. Dist.*, No. 0:08-cv-61367-JIC, 2009 WL 2731274, at *6 (S.D. Fla. Aug. 26, 2009)).

The Secretary did not materially dispute that the plaintiffs' EEO complaints qualified as statutorily protected activity, but did dispute Ms. Hollingsworth's claim that her EEO complaint was placed before the personnel action Ms. Hollingsworth challenged (that is, Ms. Griffin-Hall's termination recommendation). (*Id*. at 26). The prior order concluded a genuine dispute of material fact existed as to whether the challenged personnel action occurred

before Ms. Hollingsworth submitted her EEO complaint. (*Id*. at 28–29). Thus, both parties established they were engaged in statutorily protected activity. (*Id*. at 29).

The prior order then turned to examining whether and what materially adverse employment actions the plaintiffs suffered. (*Id*.). The prior order defined a materially adverse employment action in Title VII retaliation suits as "one that 'might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (*Id*.) (*citing Burlington*, 548 U.S. at 68). The prior order concluded three discrete acts against Ms. Sly constituted materially adverse employment actions under Title VII: (1) an October 2018 reprimand for allegedly failing to "follow instructions by not documenting that she followed the validation process 12 under the Standard Operating Procedure Ms. Sly signed on January 10, 2018" (Doc. 65, Ex. A-37); (2) a January 2019 reprimand for "failure to provide supervisory oversight related to the backlog of ROI requests" and "failure to safeguard confidential information based on the unaccounted missing ROI requests" (Doc. 65, Ex. A-35; Doc. 85, Ms. Brown Supplemental Declaration, ¶ 8); and (3) a November 2015 performance appraisal by Ms. Griffin-Hall with an overall rating of "fully successful" (Doc. 83, ¶ 55).[12] (Doc. 87, p. 34). The prior order further concluded

---

[12] Before this November 2015 performance appraisal, Ms. Sly only received "outstanding" ratings, which led to performance bonuses. (Doc. 65, Ex. A, 282:6–12).

the only materially adverse employment action Ms. Hollingsworth identified was her termination from her position at Bay Pines VA. (*Id*. at 35).

The Secretary did not materially dispute causation. (*Id*.). Thus, the prior order concluded Ms. Sly and Ms. Hollingsworth had established a prima facie case of Title VII retaliation. (*Id*.). The prior order then shifted the burden of production to the Secretary to rebut the presumption of retaliation by offering "legitimate, nondiscriminatory reasons for the adverse actions." (*Id*.) (*citing Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006)). The prior order concluded the Secretary's justifications ("poor performance" for Ms. Sly and "Ms. Hollingsworth's failure to follow instructions, her abrasive and disrespectful attitude and demeanor in BOS, and her privacy violation") were legitimate and nondiscriminatory. (*Id*. at 36) (*citing* (Doc. 65, pp. 15–16, 26)). However, the prior order also concluded Ms. Sly and Ms. Hollingsworth rebutted the Secretary's reasons and presented disputes of material fact that established triable issues of pretext. (*Id*. at 37–39). Therefore, the prior order determined Ms. Sly and Ms. Hollingsworth established a prima facie case of retaliation. (*Id*. at 39). Thus, the prior order

---

Ms. Sly's "fully successful" performance appraisal did not grant her the opportunity for a performance bonus, a bonus that could reach up to two percent of her yearly salary. (Doc. 65, Ex. A, 281:24–283:1). The prior order concluded the performance appraisal's impact on Ms. Sly's ability to obtain a performance bonus constituted a "material change in the privilege. . . of her employment" sufficient to constitute a material adverse action. (Doc. 87, p. 32) (*citing Vidovic v. City of Tampa*, No. 8:16-cv-714-EAK-CPT, 2017 WL 10294807, at *7 (M.D. Fla. Oct. 12, 2017)).

declined the Secretary's motion for summary judgment on Ms. Sly's and Ms. Hollingsworth's retaliation claims (Count I). (*Id*.).

### 2. Hostile Work Environment

The prior order then turned to examining the plaintiffs' retaliatory hostile work environment claims. (*Id*.). The prior order applied the retaliatory hostile work environment standard from *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012) to Ms. Sly's and Ms. Hollingsworth's claims. (*Id*. at 39–40). This standard requires a plaintiff show "(1) she engaged in protected EEO activity; (2) after doing so, she faced unwelcome harassment; (3) the harassment was based on her protected activity; and (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment." (*Id*.) (*citing Gowski*, 682 F.3d at 1312).

The prior order concluded the three discrete acts against Ms. Sly that established a triable issue of Title VII retaliation "on their own" did not support a retaliatory hostile work environment claim. (*Id*. at 42). The prior order further concluded the other discrete acts and events alleged by Ms. Sly amounted to no more than "'petty office squabbles,' differences in management styles, and communication issues common in workplaces." (*Id*.) (*citing Baroudi v. Sec'y, U.S. Dep't of Veteran's Affairs*, 616 F. App'x 899, 904 (11th Cir. 2015). The prior order therefore determined Ms. Sly had not established events sufficiently severe or frequent to support a retaliatory hostile work

environment claim.

Similarly, the prior order concluded the sole discrete act establishing Ms. Hollingsworth's Title VII retaliation claim did not support a retaliatory hostile work environment claim. (*Id*. at 43). The prior order further concluded the other discrete acts alleged by Ms. Hollingsworth "focus[ed] on [her] performance as an employee and monitoring an employee's performance," which does not constitute a hostile work environment. (*Id*.) (*citing McCoy v. Macon Water Auth.*, 966 F. Supp. 1209, 1221 (M.D. Ga. 1997)). Thus, the prior order concluded neither Ms. Sly nor Ms. Hollingsworth established acts sufficiently severe or frequent to support a hostile work environment. (*Id*. at 44). On that basis, the prior order granted the Secretary's motion for summary judgment on Ms. Sly's and Ms. Hollingsworth's retaliatory hostile work environment claims (Count II). (*Id*.).

### 3. Race Discrimination

The prior order finally analyzed the plaintiffs' race discrimination claims. (*Id*.). However, because Ms. Hollingsworth (as mentioned previously) did not exhaust her administrative remedies, the prior order only addressed the merits of Ms. Sly's race discrimination claim. (*Id*.). The prior order then analyzed Ms. Sly's discrimination claim under two theories: a single-motive theory, and a mixed-motive theory. (*Id*.). The prior order applied the *McDonnell Douglas* framework in evaluating Ms. Sly's discrimination claim

26

under the single-motive theory, requiring Ms. Sly to establish a prima facie case of race discrimination. (*Id.* at 44–45). This prima facie case required Ms. Sly to show: "(1) she was a member of protected class; (2) she faced an adverse employment action; and (3) similarly situated employees outside the protected class were treated more favorably." (*Id.* at 45) (*citing Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (abrogated on other grounds)).

Once the prima facie case is established, the prior order concluded the *McDonnell Douglas* framework again takes effect, requiring the Secretary to articulate a legitimate, non-discriminatory reason for the adverse employment. (*Id.*). "Then the burden shifts back to the plaintiff to show the stated reason is pretextual and not the true reason for the adverse employment action." (*Id.*) (*citing Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)). The prior order further concluded the standard for a mixed-motive theory was merely that Ms. Sly offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action." (*Id.*) (*citing Quigg v. Thomas Cty. School Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016)). The prior order also noted the "convincing mosaic" test applied under both single-motive and mixed-motive theories, stating "the plaintiff 'will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning

27

the employer's discriminatory intent.'" (*Id.*) (*citing Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Because for summary judgment purposes, the Secretary did not contest whether Ms. Sly could establish a prima facie case of race discrimination, the prior order only examined whether Ms. Sly could establish the Secretary's legitimate, nondiscriminatory reasons for taking adverse employment actions against Ms. Sly were pretextual. (*Id.* at 46). The prior order concluded Ms. Sly relied on the same discrete acts as her Title VII retaliation claim to show Ms. Griffin-Hall discriminated against Ms. Sly because of her race, but proffered "no evidence showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the Secretary's proffered reasons." (*Id.* at 47) (*citing Porter v. American Cast Iron Pipe Co.*, 427 Fed. App'x 734, 736 (11th Cir. 2011)). The prior order further concluded Ms. Sly raised no argument showing Ms. Sly's race was a motivating factor (or played any role) in any discrete act conducted by the Secretary. (*Id.*). On that basis, the prior order concluded Ms. Sly "present[ed] no facts showing a triable issue of fact about Ms. Griffin-Hall's discriminatory intent" and granted the Secretary's motion for summary judgment as to Ms. Sly's race discrimination claim (Count III). (*Id.*).

## B.   Relevant Jurisprudential Developments

Nine days after this court entered its prior order on the Secretary's

motion for summary judgment, the Eleventh Circuit issued its decision in *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020). In *Monaghan*, the Eleventh Circuit discarded the "articulation of the retaliation standard in *Gowski*" as "inconsistent" with *Burlington Northern*. *Id*. at 862. In particular, the Eleventh Circuit in *Monaghan* discarded *Gowski*'s definition of the level of materiality necessary to establish an adverse employment action in Title VII retaliatory hostile work environment cases. *Id*. Where the court in *Gowski* held plaintiffs bringing a Title VII retaliatory hostile work environment claim must show the allegedly retaliatory mistreatment was "sufficiently severe or pervasive to alter the terms and conditions of employment," 682 F.3d at 1312, the court in *Monaghan* recognized that a retaliatory hostile work environment claim is, for Title VII purposes, a form of retaliation. *Monaghan*, 955 F.3d at 862. As such, the court in *Monaghan* returned to an earlier standard from *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) and held plaintiffs raising retaliatory hostile work environment claims under Title VII now need only show the same level of materiality as plaintiffs raising prototypical retaliation claims: that the workplace harassment was of a kind that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*.

Four days after the Eleventh Circuit decided *Monaghan*, the Supreme Court issued *Babb v. Wilkie*, 140 S. Ct. 1168, 206 L.Ed.2d 432 (2020) (hereafter

referred to as *Babb I*). *Babb I* was an appeal from an Eleventh Circuit decision granting (in relevant part) summary judgment on the plaintiff's age discrimination claim under the Age Discrimination in Employment Act (ADEA). *Babb I*, 140 S. Ct. at 1171. In *Babb I*, the Court granted certiorari on "[w]hether the federal-sector provision of the Age Discrimination in Employment Act of 1967, which provides that personnel actions affecting agency employees aged 40 years or older shall be made free from any 'discrimination based on age,' 29 U.S.C. § 633a(a), requires a plaintiff to prove that age was a but-for cause of the challenged personnel action." *Babb v. Wilkie*, 139 S. Ct. 2775, 204 L.Ed.2d 1156 (2019) (mem.). The Court in *Babb I* held in the affirmative, deciding the ADEA's "critical statutory language ('made free from any discrimination based on age') demands that personnel actions be untainted by any consideration of age." *Babb I*, 140 S. Ct. at 1171. Thus, the Court in *Babb I* determined claims brought under Section 633a(a) of the ADEA require a showing that "age must be the but-for cause of *differential treatment*, not that age must be a but-for cause of *the ultimate decision*." *Id.* at 1173 (emphasis added).

In reevaluating *Babb I* on remand, the Eleventh Circuit compared the relevant statutory text regarding age discrimination from the ADEA, 29 U.S.C. § 633a(a), ("All personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . *shall be made free from any*

30

*discrimination based on* age") to the relevant statutory text concerning federal-sector Title VII discrimination, 42 U.S.C. § 2000e-16(a), ("All personnel actions affecting employees . . . in executive agencies . . . *shall be made free from any discrimination based on* race, color, religion, sex, or national origin") and found "Title VII's federal-sector provision uses the exact same phrasing to bar discrimination based on other characteristics." *Babb v. Sec., Dep't. of V.A.*, 992 F.2d 1193, 1198–1199 (11th Cir. 2021) (emphasis added) (hereafter referred to as *Babb II*). The court in *Babb II* thus concluded *Babb I*'s "textual analysis of the ADEA's parallel provision controls our reading of Title VII," necessitating the application of the revised causation standard from *Babb I* to federal-sector Title VII discrimination cases. *Id*. at 1203. The court in *Babb II* also noted the impact of this conclusion spreads beyond basic federal-sector discrimination cases under Title VII, reaffirming that "retaliation for complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)." *Id*. (*citing Porter v. Adams*, 639 F.2d 273, 277–278 (11th Cir. 1981)).

Since *Babb II*, the Eleventh Circuit has written several unpublished[13] decisions attempting to further refine the standards applicable to Title VII retaliation and discrimination cases. Just six days after *Babb II*, an Eleventh

---

[13] Unpublished Eleventh Circuit opinions "are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

Circuit panel vacated and remanded a decision from the Middle District of Florida in light of *Babb I* and *Babb II*. *Durr v. Sec'y, Dep't. of V.A.*, 842 Fed. App'x 246, 247 (11th Cir. Apr. 7, 2021). In doing so, the court held for federal-sector Title VII discrimination claims, "[b]ecause both the *McDonnell Douglas* framework and the convincing-mosaic test are methods of showing that the protected characteristic was the but-for cause of the ultimate decision, those tests no longer apply." *Id.*

As later explained by a separate Eleventh Circuit panel in *Malone v. U.S. Attorney General*, "the fact that there may be non-pretextual reasons for an adverse employment action 'doesn't cancel out the presence, and the taint, of discriminatory reasons'" that *Babb I* and *Babb II* now hold as the basis of a prima facie case for federal-sector Title VII discrimination claims. *Malone v. U.S. Attorney General*, 858 Fed. App'x 296, 301 (11th Cir. 2021) (*citing Babb II*, 992 F.3d at 1204). Thus, the court in *Malone* concluded "the *McDonnell Douglas* framework no longer applies to claims brought under 42 U.S.C. § 2000e-16(a)." *Id.* Another Eleventh Circuit panel examining federal-sector Title VII claims utilized the *McDonnell Douglas* framework and convincing-mosaic test in concluding no evidence existed showing a plaintiff's "race or color played any role" in any materially adverse employment actions, but in doing so "recognized that the *McDonnell Douglas* evidentiary framework is not well suited for analyzing Title VII federal-sector claims." *Troupe v. Dejoy*, 861 Fed.

App'x. 291, 294–295 (11th Cir. June 21, 2021) (*citing Babb II*, 992 F.3d at 1204).

With full acknowledgment that the fresh nature of these decisions leaves room for good-faith differences in application, the sum of the recent case law developments appears to be as follows:

1. Under *Monaghan*, because retaliatory hostile work environment claims now fall under the broad umbrella of "retaliation" claims, Title VII retaliation and retaliatory hostile work environment claims now share a common definition for a material adverse employment action: one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan*, 955 F.3d at 862 (*citing Burlington Northern*, 548 U.S. at 68).

2. Further, because "'discrimination,' as used in Title VII's federal-sector provision, by its own terms includes retaliation," Title VII federal-sector retaliation claims where the retaliation is against "complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)." *Babb II*, 992 F.3d at 1203.

3. Thus, for Title VII purposes, retaliatory hostile work environment claims are a subset of retaliation claims. For federal-sector Title VII cases, retaliation claims where the retaliation is rooted in discrimination are a subset of discrimination claims. The same

causation standard now applies to federal-sector Title VII retaliation, retaliatory hostile work environment, and discrimination claims: that the statutorily protected activity was the but-for cause of some differential treatment. *Babb II*, 992 F.3d at 1203.

## C.    Impact

On reconsideration, this order will examine the impact of these jurisprudential shifts on the conclusions from this court's prior order on the Secretary's motion for summary judgment, beginning with Ms. Sly's and Ms. Hollingsworth's retaliation claims.

## I.  Title VII Retaliation Claim

As previously discussed, the twin decisions from the Supreme Court and Eleventh Circuit in *Babb I* and *Babb II* combine to create a new causation standard for federal-sector Title VII retaliation claims where discrimination allegedly forms the root of the retaliatory act. A plaintiff now needs only show the statutorily protected activity she engaged in was the but-for cause of some differential treatment by her federal employer, rather than showing the activity was the but-for cause of the challenged materially adverse action itself. *Babb II*, 992 F.3d at 1205.

However, the Secretary does not contest causation in their original motion for summary judgment (Doc. 65) or in this motion for reconsideration. (Doc. 125, p. 8). The plaintiffs also do not dispute causation, and instead contest

what this court's prior order determined were materially adverse employment actions. (Doc. 130, pp. 24–36). But the standard for what constitutes a materially adverse employment action in Title VII retaliation claims has not changed; "the Supreme Court's decision in [*Babb I*] did not affect that particular requirement." *Tonkyro v. Sec'y, Dep't. of V.A.*, 995 F.3d 828, 832 n. 1 (11th Cir. 2021). As such, the jurisprudential developments since *Monaghan* and *Babb I* do not affect this court's prior ruling as to the Secretary's motion for summary judgment on the plaintiffs' retaliation claims (Count I). Thus, for the reasons stated in this court's prior order, the Secretary's motion for summary judgment as to Ms. Sly's and Ms. Hollingsworth's retaliation claims (Count I) is denied.

## II. Hostile Work Environment

Unlike the plaintiffs' retaliation claims, recent case law developments have changed the standards the prior order applied in granting the Secretary's motion for summary judgment as to the plaintiffs' retaliatory hostile work environment claims. In particular, the prior order relied upon the definition of a materially adverse action from *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012). That definition has since been discarded by the Eleventh Circuit's decision in *Monaghan*. *See Monaghan*, 955 F.3d at 862; *Babb II*, 992 F.3d at 1206 (noting *Monaghan* "effectively overruled *Gowski* insofar as it applied to retaliatory hostile work environment claims"). A plaintiff raising a federal-

sector Title VII retaliatory hostile work environment claim must now establish the harassment was of a kind that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan*, 955 F.3d at 861 (*citing Burlington Northern*, 548 U.S. at 68).

The plaintiffs argue at length that summary judgment must be denied as to their retaliatory hostile work environment claim because the hostile work environment they were subjected to was itself a personnel action. (Doc. 130, pp. 16–20). The plaintiffs are correct that by folding Title VII retaliatory hostile work environment claims under the umbrella of Title VII retaliation claims, the subject of judicial review is now whether the total sum of workplace harassment in retaliation for the plaintiff's statutorily protected activity is severe enough to satisfy the standard of *Burlington Northern*. In this way, courts must now process Title VII retaliatory hostile work environment claims how they treat "retaliation claims based on discrete acts." *Tonkyro*, 995 F.3d at 836. Should the plaintiffs make the required showing, the totality of the harassment is examined like a discrete act constituting a material adverse employment action for Title VII purposes. *See, e.g., Williams-Evans v. Advance Auto Parts*, 843 Fed. App'x 144, 148–149 (11th Cir. 2021) (examining whether a retaliatory hostile work environment is a material adverse employment action under the Americans with Disabilities Act (ADA), which is analyzed "under the same framework used for Title VII retaliation claims").

The standard for evaluating a retaliatory hostile work environment claim under Title VII is therefore similar to the standard for evaluating retaliation claims under Title VII. First, a plaintiff must establish she engaged in a statutorily protected activity. *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012). Second, she must show she suffered harassment or some other form of adverse conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan*, 955 F.3d at 862–863 (*citing Burlington Northern*, 548 U.S. at 68). Finally, she must show a causal link between the protected activity and the adverse action. Since Eleventh Circuit precedent informs that retaliation for complaining about discrimination is itself a form of discrimination, this causal link for federal-sector Title VII hostile work environment claims is the same as for federal-sector Title VII discrimination claims: that the statutorily protected activity was the but-for cause of some harassment suffered from by the plaintiff. *Babb II*, 992 F. 3d at 1209.

This court previously found, construing facts in favor of the plaintiffs for purposes of the summary judgment motion, Ms. Sly engaged in statutorily protected activity by submitting an EEO complaint on June 24, 2015 and Ms. Hollingsworth engaged in statutorily protected activity by submitting an EEO complaint on December 22, 2016. (Doc. 87, pp. 26–29). As with the plaintiffs' other retaliation claims, the Secretary does not dispute causation. (Doc. 125,

pp. 11–16). Instead, the Secretary argues any differential treatment Ms. Sly or Ms. Hollingsworth experienced at Bay Pines was not treatment that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. (*Id.*).

The plaintiffs focus their response on "the process [Ms. Griffin-Hall] set up . . . that led to significant changes in the supervisor's duties, responsibilities and working conditions under §§(xii) and involved abuses of authority, backlogs and missing requests which never happened to Sly before." (Doc. 130, p. 24).  The plaintiffs repeatedly state these changes caused differential treatment of a fashion that "a jury can find is targeted and based on retaliation." (Doc. 130, p. 32).

But the "petty office squabbles, differences in management styles, and communications issues common in workplaces" described throughout Ms. Sly's briefs are insufficient to establish mistreatment of a level that might have dissuaded a reasonable person from reporting any adverse behavior. (Doc. 87, p. 42). Similarly, "Ms. Griffin-Hall criticiz[ing] Ms. Hollingsworth for not agreeing with her, for Ms. Hollingsworth speaking back to Ms. Griffin-Hall, and for Ms. Hollingsworth not following Ms. Griffin-Hall's requests" does not establish a hostile work environment. (*Id.* at 43 n. 18).

The plaintiffs assert prior lawsuits against officials at Bay Pines for charges of discrimination and retaliation form a black cloud of "circumstances

38

and context that are critical to an assessment of the acts [Bay Pines] management took." (Doc. 130, p. 15). The plaintiffs cite dicta from *Burlington Northern* to describe how the "history of retaliation at the Bay Pines VAHCS . . . has to also affect how a reasonable employee would feel about both the acts that are being taken against him or her and the significance they attribute to those acts, as they grow in number, variety and impact." (Doc. 130, p. 27). According to the plaintiffs, knowledge of the litigation history at Bay Pines colors how a reasonable person would perceive their workplace environment. (*Id.*).

But Title VII is not a "general civility code for the American workplace." *Burlington Northern*, 548 U.S. at 68. A Title VII retaliatory hostile work environment claim necessarily envisions a hostile work environment created *in retaliation against* some statutorily protected activity. In particular, the litigation history the plaintiffs rely upon to substantiate their retaliatory hostile work environment claim precedes Ms. Griffin-Hall's arrival at ROI in July 2014 by several years and predates any statutorily protected activity conducted by Ms. Sly or Ms. Hollingsworth by even longer. *See* (Doc. 65, Ex. C, pp. 53–54) (wherein Ms. Griffin-Hall describes learning about the Bay Pines litigation from a coworker while shopping for groceries).

The plaintiffs continue to raise the disputed claim that Ms. Brown allegedly told Ms. Griffin-Hall she was hiring too many Black managers. (*Id.*

at 12, 19 n. 8, 24 n. 12). Though Ms. Brown was the ultimate decision maker for Ms. Sly's January 2019 reprimand, Ms. Brown was not the ultimate decision maker on Ms. Hollingsworth's termination and Ms. Brown's alleged comments and involvement in the litigation history at Bay Pines predate her involvement in Ms. Sly's reprimand by at least four years. (Doc. 71, Ex. A-2, ¶ 6; Doc. 71, Ex. E-2). While the proposition that "an act that would be immaterial in some situations is material in others" is broadly correct, the plaintiffs' fail to establish more than a tenuous connection between any prior litigation involving Bay Pines and that litigation's impact on whether a reasonable person would feel dissuaded from raising a charge of discrimination or retaliation. *Burlington Northern*, 548 U.S. at 69.

Thus, the plaintiffs do not present a triable issue of fact on whether they experienced workplace harassment of a kind that well might have dissuaded a reasonable person from making or supporting a charge of discrimination. The Secretary's motion for summary judgment as to Ms. Sly's and Ms. Hollingsworth's claim of Title VII retaliatory hostile work environment (Count II) is granted.

### D.   Title VII Race Discrimination

Since Ms. Hollingsworth did not exhaust her administrative remedies, as discussed above, the court only reexamines the merits of Ms. Sly's race discrimination claims. The parties argue at length about whether *Babb I* and

*Babb II* create a "statutory mixed-motive" standard for federal-sector Title VII discrimination cases. *See* (Doc. 130, p. 9; Doc. 132, pp. 1–3; Doc. 135, pp. 1–3). However, the new standard for evaluating federal-sector Title VII discrimination cases is far simpler: a plaintiff seeking to bring federal-sector Title VII discrimination claims need only show that certain personnel actions were tainted by "differential treatment based on a protected characteristic." *Babb I*, 140 S. Ct. at 1174. Those personnel actions "include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb I*, 140 S. Ct. at 1172–73 (*citing* 5 U.S.C. § 2302(a)(2)(A)).

Ms. Sly claims the alleged toxicity of her workplace included racial discrimination. Ms. Sly argues "[t]here has been no credible explanation let alone briefing by Defendant for failing to hire up to 7 employees or repair 3 of 4 critical machines both of which the OIG found responsible for backlogs." (Doc. 130, p. 11) (*citing* (Doc. 71, Ex. 20, pp. 117–136)). Ms. Sly again points to Ms. Brown's alleged comment and claims "[t]he history of retaliation here is not just probative of retaliation, but statements evidencing hostility to EEO activity which have been matched by a line of cases (action), puts the evidence of what was done to Sly and Hollingsworth over any line to require a trial." (*Id*. at 12).

As discussed in this court's prior order, the only statement of racial

animosity Ms. Sly claims was directed at her is a stray comment relayed by Ms. Sly's supervisor, Patricia Bowman, to whom Ms. Griffin-Hall told of her intentions to help Ms. Sly with "speaking crisply [sic]." (Doc. 87, pp. 48–51). Beyond this, Ms. Sly testified that she had not personally heard any "belittling or unflattering" comments about Black people from Ms. Griffin-Hall. (Doc. 65, Ex. A, p. 48, ¶ 11–16).

Ms. Sly continues to base much of her discrimination claims back to Ms. Brown, despite the fact that "Ms. Brown was not the decisionmaker for most of the challenged employment actions." (Doc. 87, p. 23). Even assuming as true Ms. Brown told Ms. Griffin-Hall she was hiring too many Black managers, these comments occurred years before any of Ms. Sly's protected activity. (Doc. 71, Ex. A-2, ¶ 6; Doc. 71, Ex. E-2). Further, this court previously found the history of litigation at Bay Pines repeatedly cited by Ms. Sly in support of her charge of racial discrimination did not provide a "sufficient showing . . . that the management officials were motivated by a discriminatory or retaliatory intent." (Doc. 87, p. 23 n. 16). These two conclusions lead this court to conclude Ms. Sly had provided no direct evidence of discriminatory intent from the relevant decisionmakers for Ms. Sly's protected activity. (Doc. 87, p. 23). *See also Morgan v. Kalka & Baer LLC*, 750 F. App'x 784, 787 (11th Cir. 2018) ("remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.") (*quoting Standard v.*

*A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), *abrogated on other grounds by Burlington Northern*, 548 U.S. at 53).

Much of what Ms. Sly cites to as circumstantial evidence of Ms. Griffin-Hall criticizing, "targeting," or otherwise "impair[ing] Sly's ability to perform her supervisory duties and Plaintiff Sly's employees' abilities to perform their duties within the ROI office" includes no evidence or allegations that race was a factor in any of Ms. Griffin-Hall's actions. *See* (Doc. 130, pp. 22–23) (citing affidavits). For the toxicity and disorganization Ms. Sly alleges existed at Bay Pines, Ms. Sly presents strikingly little tangible evidence that race played a role in Ms. Griffin-Hall's decisionmaking.

Ms. Sly does not present a triable issue of fact on whether a protected characteristic was the but-for cause of any differential treatment she experienced at Bay Pines. Therefore, the Secretary's motion for summary judgment on Ms. Sly's race discrimination claim (Count III) is granted.

## IV.   CONCLUSION

Therefore, the following is **ORDERED:**

1.   The Secretary's Construed Motion for Reconsideration (Doc. 125) is **GRANTED**.

2.   The Secretary's Motion for Summary Judgment as to Ms. Sly's claims (Doc. 65) is **GRANTED IN PART** and **DENIED IN PART**.

    a.   The Secretary's motion is **DENIED** as to Ms. Sly's

retaliation claim (Count I).

b. The Secretary's motion is **GRANTED** as to Ms. Sly's harassment and hostile work environment claim (Count II) and race discrimination claim (Count III).

3. The Secretary's Motion for Summary Judgment as to Ms. Hollingsworth's claims (Doc. 65) is **GRANTED IN PART** and **DENIED IN PART**.

a. The Secretary's motion is **DENIED** as to Ms. Hollingsworth's retaliation claim (Count I).

b. The Secretary's motion is **GRANTED** as to Ms. Hollingsworth's harassment and hostile work environment claim (Count II) and race discrimination claim (Count III).

4. The court will have a videoconference hearing to schedule the final pretrial conference and trial. No later than **12:00 P.M. on April 29, 2022,** the parties must submit a joint notice on the docket advising which three date and time combinations (ranked in order of preference) counsel jointly choose for the telephonic scheduling hearing from among the following options:

a. May 16, 2022 at 10:00 A.M., 11:00 A.M., 2:00 P.M., or 3:00 P.M.;

b. May 17, 2022 at 10:00 A.M., 1:00 P.M., or 2:00 P.M.;

    c.    May 18, 2022 at 10:00 A.M., 11:00 A.M., 1:00 P.M., 2:00 P.M., or 3:00 P.M.;

    d.    May 23, 2022 at 11:00 A.M.; or

    e.    May 24, 2022 at 10:00 A.M., 1:00 P.M., 2:00 P.M., or 3:00 P.M.

**ORDERED** in Tampa, Florida, on April 22, 2022.

AMANDA ARNOLD SANSONE
United States Magistrate Judge